UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re Application of ) | **Case: 1:22-mc-00064** |
| ) | **Assigned To : Leon, Richard J.** |
| KUWAIT PORTS AUTHORITY, Kuwait ) | **Assign. Date : 7/5/2022** |
| Ports Authority Complex, Jamal Abdul ) | **Description: Misc.** |
| Nasser St, Shuwaikh, Kuwait City, ) | |
| Kuwait , and THE PUBLIC ) | |
| INSTITUTION FOR SOCIAL ) | |
| SECURITY,  Block 1, Al Soor Street, Al ) | RECEIVED |
| Murqab, Kuwait City, Kuwait. ) | Mail Room |
| ) | JUL - 5 2022 |
| Petitioners, for an Order Pursuant to 28 ) | |
| U.S.C. § 1782 to Conduct Discovery for ) | Angela D. Caesar, Clerk of Court |
| Use in a Foreign Proceeding ) | U.S. District Court, District of Columbia |

## APPLICATION FOR
## DISCOVERY FOR USE IN A FOREIGN PROCEEDING

Petitioners, Kuwait Ports Authority ("KPA") and The Public Institution for Social Security

("PIFSS") (collectively, "Petitioners"), pursuant to 28 U.S.C. § 1782, hereby apply for an order

granting leave to serve Rule 45 subpoenas for documents and deposition testimony upon Crowell

& Moring LLP ("Crowell") for use in civil proceedings pending in the Grand Court of the Cayman

Islands ("Cayman Court"). In support of this Application, Petitioners state as follows.

## I.   INTRODUCTION

1.     This application for discovery relates to a lawsuit pending in the Cayman Court,

Financial Services Division, Cause No. FSD 236 of 2020 (RPJ) ("the Cayman Action"), in which

the Petitioners are parties. Broadly speaking, the Cayman Action concerns direct and derivative

claims for multiple frauds committed by the general partner of a Cayman limited partnership, The

Port Fund, L.P. ("The Port Fund"), and persons and entities acting in concert with the general

partner.

2.     Petitioners are plaintiffs in the Cayman Action. They are limited partners of The

Port Fund. In the Cayman Action, Petitioners allege that, in concert with its principal, affiliates

and certain third parties, the general partner breached its statutory, contractual, and fiduciary duties to The Port Fund by using and diverting The Port Fund's money for their own benefit rather than for the benefit of The Port Fund.

3.    Crowell acted as counsel for The Port Fund, its general partner, and affiliated parties in connection with certain of the transactions underlying Petitioners' direct and derivative claims in the Cayman Action. These transactions, and the pending claims in the Cayman Action relating to same, are described in detail in Petitioners' Re-Amended Statement of Claim in the Cayman Action, and they are summarized below. A copy of Petitioners' Re-Amended Statement of Claim is attached as Exhibit 1 of Petitioners' Appendix in Support of their Application for Discovery for Use in a Foreign Proceeding ("Petitioners' Appendix"). (App.1).[1]

4.    Petitioners seek the discovery of relevant documents in Crowell's possession, as well as deposition testimony from Crowell, for use in the Cayman Action. The particular discovery requested by Petitioners is narrow in scope and identified in the proposed subpoenas for documents and deposition testimony, which subpoenas are included in Petitioners' Appendix. (App. 2-5).

## II.    JURISDICTION AND VENUE

5.    This Application for Discovery for Use in a Foreign Proceeding is brought pursuant to 28 U.S.C. § 1782.  This Court has subject matter jurisdiction over this matter pursuant to Section 1782 and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

6.    Venue is proper in this District because Crowell, the party from which discovery is sought, is found in this District within the meaning of Section 1782.

7.    Petitioner KPA is a corporation organized under the laws of Kuwait and engaged in the management and operation of seaports. KPA maintains its principal place of business in Kuwait.

---

[1] References herein to Petitioners' Appendix are in the following format: (App. __ ).

8.    Petitioner PIFSS is a public pension fund organized under the laws of Kuwait. PIFSS maintains its principal place of business in Kuwait.

9.    Crowell is a law firm organized as a limited liability partnership. Crowell maintains its principal office in the District of Columbia and can be found in this district for the purpose of giving testimony and producing documents for use in civil proceedings pending in the Cayman Court.

## III.    PROCEDURAL STATUS OF THE CAYMAN ACTION

10.    Petitioners commenced the Cayman Action on October 14, 2020, bringing both direct and derivative claims against the general partner of The Port Fund. On February 12, 2021, Petitioners amended their claims to, among other things, add additional defendants. Petitioners again amended their claims on December 13, 2021 to, among other things, add The Port Fund as a plaintiff in the proceedings. (App. 6, Declaration of Jennifer Fox, at ¶ 9).

11.    The Cayman Action is still at the pleading stage. In applications dated June 4 and June 7, 2021, defendants in the Cayman Action moved the Cayman Court to strike (i.e., dismiss) certain of Petitioners' claims. On December 13, 2021, the Cayman Court entered an order denying defendants' applications. Defendants thereafter appealed the December 13, 2021 order to the Cayman Islands Court of Appeal. Oral argument took place between May 25 and May 26, 2022 but judgment has not yet been handed down by the Court of Appeal. (App. 6, Declaration of Jennifer Fox, at ¶ 10).

12.    On January 31, 2022, defendants in the Cayman Action filed defenses and counterclaims against Petitioners. The second, third and fourth defendants also brought cross-claims against the first defendant (the general partner of The Port Fund). Petitioners have not yet filed replies and defenses to the counterclaims. (App. 6, Declaration of Jennifer Fox, at ¶ 11).

13.    No discovery has yet been taken in the Cayman Action. Nor has a completion date for discovery been established. Moreover, the trial of the Cayman Action is not scheduled and is not expected for at least 18 months. (App. 6, Declaration of Jennifer Fox, at ⁋ 12).

14.    Petitioners have also successfully made other applications for documents and information relevant to their claims in the Cayman Action, including the following:

a.    On January 27, 2020, Petitioner KPA applied to the U.S. District Court for the Southern District of New York pursuant to 28 U.S.C. 1782 for discovery from Citibank and E-Trade Financial Corporation for use in claims then contemplated in the Cayman Islands. That application was granted on December 13, 2021. *See In re Kuwait Ports Authority*, 2021 U.S. Dist. LEXIS 238019 (S.D. N.Y. 2021).

b.    On January 29, 2020, Petitioners applied to the Cayman Court for an order pursuant to Section 22 of the Cayman Islands Exempted Limited Partnership Act to require the general partner of The Port Fund to produce to Petitioners information regarding the business, affairs and financial condition of The Port Fund. By judgment handed down on June 16, 2020, the Cayman Court granted the Petitioners' application. (App. 6, Declaration of Jennifer Fox, at ⁋⁋ 13-14); SC ⁋⁋ 4-5.

## IV.    THE KEY PARTIES IN THE CAYMAN ACTION[2]

15.    The Port Fund is now a plaintiff in the Cayman Action (the Petitioners having been given permission to pursue derivative claims on its behalf). (App. 1). It is an exempted limited partnership that was organized under Cayman law in 2007 pursuant to the Exempted Limited Partnership Act (as amended) ("ELPA"). It was formed as a private equity vehicle for investments in infrastructure assets around the world. SC ⁋⁋ 7, 38.

16.    Petitioners are plaintiffs in the Cayman Action. (App. 1). They are two of eleven limited partners that invested in The Port Fund. Petitioners invested USD 125 million in The Port

---

[2] Except where indicated otherwise, this discussion of the pending claims in the Cayman Action is derived from the allegations contained in the Petitioners' Re-Amended Statement of Claim which is attached as Exhibit 1 to Petitioners' Appendix. References to the Re-Amended Statement of Claim follow this format: SC ⁋__.

Fund and collectively hold in excess of 60% of the total limited partner investment. SC ¶¶ 2, 10-11.

17.     The general partner of The Port Fund, Port Link GP Ltd. (the "General Partner"), is a defendant in the Cayman Action. (App.1). The General Partner is a special purpose vehicle and was formed in 2007. SC ¶8. Under Section 16 of ELPA, at all times the General Partner held all rights and property of The Port Fund in trust for the benefit of The Port Fund. SC ¶ 32.

18.     Prior to May 2018, the General Partner had three directors: Marsha Lazareva ("Lazareva"), Saeed Dashti ("Dashti"), and Abdulghfoor Alwadhi ("Alwadhi"). SC ¶¶ 15, 18, 102A.

19.     Dashti, a Kuwaiti national, was a director of the General Partner from April 16, 2007 to May 24, 2018. SC ¶15. Lazareva, a Russian national, was a director of the General Partner from March 8, 2007 until May 24, 2018. SC ¶18. Dashti and Lazareva were the subject of criminal proceedings in Kuwait, charges which precipitated their resignations as Directors of the General Partner on May 24, 2018. SC ¶¶ 18, 22, 85-86.

20.     From 2009 until May 29, 2018, the General Partner was owned by KGL Investment Company K.S.C.C. ("KGLI Kuwait"), a Kuwait-based private equity and venture capital fund that was the sponsor and placement agent of The Port Fund. SC ¶¶ 12, 199. At all relevant times, Dashti was the Chairman and Lazareva was the Vice Chairman and CEO of KGLI Kuwait. SC ¶ 18.

21.     On May 30, 2018, the General Partner was acquired by Port Link Holdings USA, Inc. ("Port Link Holdings"). SC ¶¶ 8, 11A. Port Link Holdings was organized in May 2018. SC ¶ 8.

22.     Mark Williams ("Williams") is the sole director and sole shareholder of Port Link Holdings. SC ¶¶ 11A, 142, 199. Beginning in May 2018, and at all relevant times thereafter, Williams controlled the General Partner through his 100% ownership and control of Port Link

Holdings, among other ways. SC ¶¶ 11A, 142. Williams is a defendant in the Cayman Action. (App. 1).

23.    In 2007, KGL Investment Cayman Ltd. ("Investment Manager") was appointed Investment Manager of The Port Fund pursuant to an Investment Management Agreement dated June 28, 2007. SC ¶¶ 13-14. From 2004 until July 2018, the Investment Manager was owned by KGLI Kuwait. SC ¶ 13, 11A.

24.    Williams was also a senior executive of KGLI Kuwait, and he exercised substantial control over The Port Fund's Investment Manager. SC ¶ 11A.

25.    In January 2018, Henry Ayliffe acquired indirect ownership and control of the Investment Manager. Ayliffe was also a principal and ultimate beneficial owner of Apache Asia Limited which, as explained further below, received millions of dollars in payments from one or more trust accounts maintained by Crowell for the benefit of the Port Fund.

26.    In late June or early July 2018, the Investment Manager changed its name from KGL Investment Company Ltd. to Emerging Markets PE Management Ltd. ("EMPEML"). SC ¶ 13. The Investment Manager purported to terminate its Investment Management Agreement with The Port Fund on July 7, 2018. SC ¶ 14. The Investment Manager was dissolved in 2020. SC ¶65.

## V.    PROPOSED DISCOVERY FOR USE IN THE CAYMAN ACTION RELATING TO THE ALLEGED SHAM DIFC PROCEEDING

### A.    The Sale of the Port Fund's Clark Asset and the Freezing of Sale Proceeds Held in a Noor Bank Account in Dubai

27.    In 2008, The Port Fund, through a special purpose vehicle, invested in a development project located in the Philippines known as Global Gateway Logistics City, (the "Clark Asset"). SC ¶¶ 3, 38(iv).

28.    In 2017, The Port Fund's interest in the Clark Asset was sold for several hundred million U.S. dollars. SC ¶¶ 3, 38(iv).

405969152-v1\NA_DMS

29.    In November 2017, a substantial portion of the proceeds from the sale of the Clark Asset, approximately USD 496,000,000, was transferred for deposit in an account held by the General Partner at Noor Bank PJSC in Dubai ("Noor Bank"). SC ¶39.

30.    Pursuant to the instructions of the Central Bank of the United Arab Emirates and the Attorney General of Dubai, upon its transfer to Noor Bank the approximately USD 496,000,000 was frozen as a result of suspected money laundering and other criminal conduct. SC ¶40. These funds, which belonged to The Port Fund, remained frozen at Noor Bank until early February 2019, when the order freezing the funds was lifted. SC ¶40.

**B.    The Port Fund's Relationship with Crowell**

31.    In November or December 2017 The Port Fund engaged Crowell to advise it in connection with the protection and recovery of the funds frozen at Noor Bank in Dubai. SC ¶ 87. (App. 6, Declaration of Jennifer Fox, at ¶ 14).

32.    Williams possessed and exercised full authority to act on behalf of the General Partner as to all matters pertaining to the business of The Port Fund, including with regard to The Port Fund's attorney client relationship with Crowell. SC ¶¶ 146-49.

33.    At all relevant times, Crowell received, accepted and followed instructions from Williams.SC ¶142(v).

**C.    The Sham DIFC Court Proceedings**

34.    Williams used his influence over The Port Fund to fraudulently siphon proceeds from the Clark Asset sale from The Port Fund to himself, his affiliates and third parties acting in concert with him. SC ¶¶ 138-77. On behalf the General Partner, the Investment Manager, and himself, Williams obtained legal services from Crowell in furtherance of this fraud and caused The Port Fund to pay for Crowell's services. SC ¶¶ 65F, 87, 87A, 146-52.

405969152-v1\NA_DMS

35.    In July 2018, conspiring with the General Partner and the Investment Manager, Williams engineered the entry of a sham USD 56.8 million judgment in favor of the Investment Manager and against The Port Fund in the court of the Dubai International Financial Centre (the "DIFC Court"). SC ⁋⁋ 1, 29(vi), 101-33, 138-77.

36.    As alleged above, on July 7, 2018, the Investment Manager purported to terminate the Investment Management Agreement with The Port Fund. SC ⁋ 14.

37.    On July 9, 2018, the Investment Manager, pursuant to Williams' instruction, filed claims against the General Partner and the Port Fund in the DIFC Court. SC ⁋ 101. The Investment Manager claimed that the Port Fund and General Partner (both of which were ultimately controlled by Williams) breached the Investment Management Agreement by failing to pay the Investment Manager various fees, carry and interest. SC ⁋ 101.

38.    Acting on Williams' instruction, the General Partner and The Port Fund conceded venue and submitted to jurisdiction in the DIFC Court, even though proper venue for the Investment Manager's claim was the Cayman Islands. SC ⁋ 146, 163. Indeed, (i) all three litigants (the Investment Manager, The Port Fund and the General Partner) were Cayman entities: (ii) the Investment Management Agreement contains a Cayman choice of forum clause; and (iii) the Investment Management Agreement is governed by Cayman law. SC ⁋ 29(vi).  In the Cayman Action, the General Partner contests that the Cayman choice of forum clause is an exclusive jurisdiction clause, but the Petitioners maintain that it is.

39.    The General Partner raised no defense or objection to the Investment Manager's claims in the DIFC Court.  SC ⁋⁋ 101-08, 112-31. To the contrary, upon Williams' instruction, on July 11, 2018, The Port Fund and the General Partner filed a document in the DIFC Court conceding their purported joint and several liability for USD 56,808,505 in damages alleged by

the Investment Manager in the DIFC Court. SC ¶¶ 102, 102A, 104. The General Partner did so even though the Investment Manager's claims were, at the very least, inflated and potentially without any merit whatsoever. SC ¶¶ 112-31.

40.    Upon Williams' instruction, just one day later, on July 12, 2018, the Investment Manager filed a Request for Default Judgment against Port Fund and the General Partner. SC ¶ 106. The General Partner did not take any step to appeal or otherwise challenge the judgment. SC ¶ 108.

41.    On July 25, 2018, the DIFC Court entered a final judgment in favor of the Investment Manager and against The Port Fund and the General Partner in the amount of USD 56,808,505 plus interest. SC ¶ 107. This judgment was re-issued on July 31, 2018 by the DIFC Court correcting certain references to DIFC procedural law. SC ¶ 107.

42.    Crowell, as well as the Dubai office of the Cayman law firm of Walkers LLP ("Walkers"), advised both The Port Fund and the General Partner, on the one hand, and the Investment Manager, on the other hand, in connection with the Investment Manager's alleged claims against The Port Fund and the General Partner in the DIFC Court, even though the interests of the Investment Manager were directly opposed to those of The Port Fund and the General Partner. SC ¶¶ 146-65, 168.

43.    In early February 2019, the UAE Central Bank unfroze the proceeds of the Clark Asset sale that were in the account held by the General Partner at Noor Bank. SC ¶ 82.

44.    The General Partner immediately instructed Noor Bank to initiate a payment, ostensibly in satisfaction of the DIFC judgment entered in favor of the Investment Manager (together with accrued interest), for USD 59,990,461.30 to "Wellspring Capital Group, Inc" in

Thomasville, Georgia ("Wellspring") (the "Wellspring Payment"). SC ¶¶ 29(vi), 109 -109A, 171-74. The Wellspring Payment was made on or about February 7, 2019. SC ¶ 173.

45.     One hundred percent of the shares of Wellspring are held by the Mark E. Williams Living Trust, the trustees of which are Williams, his spouse and his brother. SC ¶¶ 1(ii), 11B. Williams is the CEO, CFO, President, Vice President, Treasurer and Secretary of Wellspring. SC ¶ 11B. Wellspring is a defendant in the Cayman action. (App. 1).

46.     In summary, Williams knowingly advanced an inflated and/or unfounded claim against The Port Fund on behalf of the Investment Manager, concluded the claim on behalf of The Port Fund and the General Partner, and then directed that the enormous resulting sum be paid to an entity of which he and/or his family have a beneficial interest.

47.     The nature, appropriateness and accuracy of Crowell's advice is highly relevant to the Cayman Action concerning whether Williams and the General Partner were justified in conceding jurisdiction and liability in the DIFC Court proceedings and whether in doing so they breached their fiduciary, statutory and contractual duties to the Port Fund. (App. 6, Declaration of Jennifer Fox, at ¶ 18).

48.     As set forth in their Proposed Rule 45 Subpoena for Documents to Crowell & Moring LLP, which is attached as Exhibit 2 to Petitioners' Appendix, Petitioners seek from Crowell documents relating to (i) the Investment Manager's claims against The Port Fund and the General Partner for breach of the Investment Management Agreement and demand for payment of approximately USD 56.8 million from the Port Fund and the General Partner; (ii) the proceedings before the DIFC Court (Case No. CFI-050-2018); and (iii) the Wellspring Payment, i.e., the payment of USD 59,990,461.30 by The Port Fund to Wellspring on or about February 7, 2019. The documents requested in the proposed Rule 45 subpoena include:

a. All records of communications involving or referring to the Investment Manager's claim for breach of the Investment Management Agreement, the Investment Manager's demand for payment from The Port Fund, the proceedings before the DIFC Court, and the Wellspring Payment, including communications with Williams, Wellspring, the Investment Manager, the General Partner, The Port Fund, and the law firms of Walkers Dubai LLP, Walkers (Cayman) LLP, Global Advocacy, Clyde & Co. and Laktineh & Co.

b. All documents, including draft documents, internal communications and notes, reflecting Crowell's consideration, analysis and /or advice in connection with the Investment Manager's claim for breach of the Investment Management Agreement, demand(s) for payment, the proceedings before the DIFC Court, and the Wellspring Payment.

c. All engagement letters (or other communications reflecting the fact and /or terms of Crowell's engagement) directly or indirectly relating to the Investment Manager's claims against The Port Fund and the General Partner for breach of the Investment Management Agreement, the proceedings before the DIFC Court and/or the Wellspring Payment.

d. All invoices reflecting services performed by Crowell for The Port Fund, the General Partner, the Investment Manager, Williams and/or any other person or entity regarding the Investment Manager's claim for breach of the Investment Management Agreement, the proceedings before the DIFC Court, and/or the Wellspring Payment.

e. All documents and communications in relation to Crowell's conflicts checks, anti-money laundering checks, or due diligence regarding the legal services it provided to The Port Fund, the General Partner, the Investment Manager, Port Link Holdings, Williams, Wellspring, and/or any other person or entity in connection with the Investment Manager's claims for breach of the Investment Management Agreement, the proceedings before the DIFC Court, and/or the Wellspring Payment.

(App. 2).

49.     As set forth in their Proposed Rule 45 Subpoena for Rule 30(b)(6) Deposition, Petitioners also seek testimony from Crowell under Federal Rule 30(b)(6) with regard to the following matters for use in the Cayman Action:

a. Crowell's consideration and analysis of the Investment Manager's claims against The Port Fund and the General Partner for breach of the Investment Management Agreement, and the advice Crowell provided

The Port Fund, the General Partner, the Investment Manager, Williams and/or any other person or entity regarding same.

b.  Crowell's communications with The Port Fund, General Partner, Williams, the Investment Manager, and/or any other person or entity, and their respective agents or representatives, concerning the claims made by the Investment Manager in the DIFC Court, including communications pertaining to the choice of forum, submission to jurisdiction, the remedies requested by the Investment Manager, The Port Fund's admission of liability, and in the Port Fund's consent to the entry of a judgment against it in the DIFC Court.

c.  Crowell's communications with The Port Fund, the General Partner and Williams concerning Port Link Holdings USA's acquisition of the General Partner.

d.  Crowell's communications with The Port Fund, the General Partner, the Investment Manager, Wellspring, Williams and /or any other third person or entity regarding (i) The Port Fund's satisfaction of the judgment entered against it by the DIFC Court: and (ii) the Wellspring Payment.

(App. 3).

50.    Petitioners also propose to take the depositions of Crowell attorneys David Hammond and Justin Kingsolver for use in the Cayman Action. (App. 4 and 5). As reflected in Crowell's invoices, Hammond managed Crowell's client relationship with The Port Fund and was at all relevant times primarily responsible for the work performed by Crowell for the Port Fund. Kingsolver was involved in advising The Port Fund in connection with the Investment Manager's claims against The Port Fund for breach of the Investment Management Agreement. SC ¶¶ 148-50. As reflected in Crowell's July 2018 invoice to The Port Fund, he prepared a draft of the complaint filed by the Investment Manager against The Port Fund in the DIFC Court. SC ¶150.

## VI.    PROPOSED DISCOVERY FOR USE IN THE CAYMAN ACTION RELATING TO PAYMENTS TO APACHE, LAW CUSTODIAL, INC., AND KGLI KUWAIT

51.    In the Cayman Action, Petitioners claim that defendants conspired to unlawfully divert approximately USD 58.5 million of the proceeds from the sale of the Clark Asset to a Hong

Kong company called Apache Asia Limited and its Macau affiliate, "apacheAsia Limitada" (collectively, "Apache"), and Apache's designees (namely, KGLI Kuwait and Law Custodial Inc.). SC ¶¶ 29(ii) 46-72; Annex 2, at pp. 91-92.

52.     Apache was closely associated with, among others, the Investment Manager, Williams' brother, Matt Williams, and Williams. SC ¶¶ 61-64C.

53.     On April 17, 2015, The Port Fund engaged Apache purportedly to help The Port Fund sell the Clark Asset in exchange for a success fee. SC ¶ 65A. The terms of the engagement were not at arm's length and were commercially unreasonable for The Port Fund. SC ¶¶ 67-68. If the sale price exceeded USD 600 million, the success fee was 7 per cent of the sale price. SC ¶ 65B.

54.     Apart from small prior engagements with The Port Fund, Apache had no track record of providing advisory services to any other person or entity. SC ¶¶ 29(ii), 56-60. There is no publicly available information to indicate that Apache is or was an enterprise of any substance beyond the person of its founder. SC ¶¶ 56-60. To the best of Petitioners' knowledge, Apache has never undertaken any business other than that which it purportedly undertook on behalf of The Port Fund. SC ¶¶ 29(ii), 56-57.

55.     Apache provided no material, legitimate services to The Port Fund in connection with the sale of the Clark Asset. SC ¶ 66. In any event, the fees claimed by Apache far exceeded the market value of any legitimate services Apache claims to have provided. SC ¶ 68(iv). Apache's purported fees (for work it does not appear to have performed) were between 4.5 and 7 times larger than the market rate charged by established and leading investment banking firms for similar advisory services. SC ¶ 68(iv).

56.     Petitioners allege in the Cayman Action that on February 8, 2019, just days after the funds held by the General Partner at the Noor Bank were unfrozen, Apache sent a USD 36.2 million invoice to the General Partner for some but not all of the work Apache had purportedly performed in connection with the sale of the Clark Asset. SC ℙℙ 3(iv).

57.     Apache directed the General Partner to pay USD 14,550,000 of the USD 36.2 million it claimed was owed by The Port Fund to KGLI Kuwait, the former owner of the Investment Manager. SC ℙℙ 3(iv), 64D, 67(iv), 68(iv).

58.     Apache then instructed Crowell to transfer USD 14,550,000 from the trust account Crowell maintained for the benefit of The Port Fund to KGLI Kuwait, namely an account called "C and M LLP DC IOLTA Trust." SC ℙ 65F; Annex 2, at pp. 91-92 Crowell complied with Apache's instruction. SC ℙ 65F; Annex 2, at pp. 91-92.

59.     In the Cayman Action, Petitioners allege that there was no legitimate reason for The Port Fund to make this payment to KGLI Kuwait. SC ℙ 65G. Rather, the USD 14,550,000 payment to KGLI Kuwait was a kickback to KGLI Kuwait (and / or persons associated with it) in exchange for allowing Apache to collect the balance of its claimed success fee relating to the services Apache claimed to provide The Port Fund in connection with the sale of the Clark Asset. SC ℙℙ 65G, 67-71.

60.     On February 14, 2019, Crowell also transferred from its trust account USD 21,650,000 (the balance of the USD 36.2 million Apache invoice) to an account held by "Law Custodian Inc." at OCBC Wing Hang Bank in Hong Kong. SC ℙℙ 3(iv), 67-68, Annex 2, at pp. 91-92. As Petitioners allege in the Cayman Action, this payment by The Port Fund amounted to a breach of the General Partner's duties to The Port Fund and appears to have been for the benefit of KGLI, the Investment Manager, Williams and /or associated persons and entities. SC ℙℙ 67-70.

61.     Crowell attorneys' time entries show that it advised and charged The Port Fund for work it performed in connection with the Apache payments identified above. (App. 6, Declaration of Jennifer Fox, at ¶ 21). Among other things, Crowell charged The Port Fund for drafting representations and warranties for Apache to make concerning its compliance with anti-bribery laws.

62.     As set forth in its proposed subpoena for documents directed to Crowell, Petitioners seek the following documents from Crowell, all of which are highly relevant to Petitioners' claims, for use in the Cayman Action:

      a.  All documents and communications related to the payments of (i) USD 21,650,000 to Law Custodial Inc. on or around 14 February 2019 (the "Law Custodial Payment") and (ii) USD 14,550,000 to KGLI Kuwait on or around 1 March 2019 (the "KGLI Payment" and together with the Law Custodial Payment, the "Apache Payments") including without limitation:

            i.  Documents and communications sufficient to show (i) the account number of the destination account for the Apache Payments; (ii) the account holder of the destination account for the Apache Payments; (iii) the identity of all intermediary banks involved in the Apache Payments; (iv) the stated purpose or reason for the Apache Payments; and (v) any other details concerning the Apache Payments.

           ii.  All communications or records of communications involving any representatives of the General Partner, Williams, Apache, and/or KGLI Kuwait regarding the Apache Payments.

         iii.  All internal communications, notes, memoranda or other documents regarding the Apache Payments.

         iv.  All engagement letters connected to the Apache Payments.

           v.  All documents and internal and external communications in relation to Crowell's conflicts checks, anti-money laundering checks, or due diligence regarding the Apache Payments.

         vi.  All Crowell invoices relating to the Apache Payments.

(App. 2).

63.    As set forth in their Proposed Rule 45 Subpoena for Rule 30 (b)(6) Deposition, Petitioners also seek testimony from Crowell under Federal Rule 30 (b)(6) with regard to the following matters for use in the Cayman Action:

    a.    Crowell's internal and external communications relating to the Apache Payments.

    b.    Crowell's consideration and analysis of the reasons for and the propriety of Apache Payments, including the services or consideration The Port Fund received from KGLI Kuwait and / or Law Custodial in exchange for the Apache Payments.

(App. 3).

64.    The documents and the testimony sought by Petitioners will show why these payments were made and whether they were justified.  (App. 6, Declaration of Jennifer Fox, at ¶¶ 19-22).

## VII.    PROPOSED DISCOVERY FOR USE IN CAYMAN ACTION RELATING TO PAYMENTS TO LAWYERS, LOBBYISTS, PUBLIC RELATIONS CONSULTANTS AND OTHER THIRD PARTIES

65.    In the Cayman Action, Petitioners claim that, using the released funds in the Noor Bank Account, the General Partner caused The Port Fund to make numerous large payments to firms or entities that provided legal, public relations, and/or lobbying services, at least a substantial portion of which were not for the benefit of The Port Fund and indeed were, in some instances, contrary to the interests of The Port Fund. SC ¶¶ 82-93.

66.    The services (the "Disputed Services") and related payments are identified in Annex 1 to the Re-Amended Statement of Claim in the Cayman Action, which consists of the chart below:

405969152-v1\NA_DMS

| Recipient | Amount paid (USD) from the Noor Bank Account | Stated Description of Purpose of Engagement |
|---|---|---|
| Squire Patton Boggs LLP | 1,405,930.69 | Engaged to provide legal and other services and assist with the Fund's efforts to unfreeze the USD 496 Million held by Noor. |
| Navigant Consulting, Inc. | 229,593.56 | Engaged to provide services in support of legal advice to the Fund and the GP. |
| Brownstein Hyatt Farber Schreck LLP | 561,500.00 | Engaged to provide legal and other services and assist with the Fund's efforts to unfreeze the USD 496 Million held by Noor. |
| Marathon Strategies, LLC | 260,795.18 | Engaged to provide services to assist in Fund's efforts to unfreeze the USD 496 Million held by Noor and protect the reputation of the Fund. |
| diGenova & Toensing, LLP | 23,875.00 | Engaged to provide services and assist with the Fund's efforts to unfreeze the USD 496 Million held by Noor. |
| Fahmy Hudome International LLC | 565,000.00 | Engaged to provide services and assist with the Fund's efforts to unfreeze the USD 496 Million held by Noor. |
| Neil Bush | 1,085,833.33 | Engaged to provide services and assist with the Fund's efforts to unfreeze the USD 496 Million held by Noor. |
| Triple Canopy Media LLC | 135,000.00 | Engaged to provide services to the Fund in support of the Fund's efforts to unfreeze the USD 496 Million held by Noor. |
| Laktineh & Co Ltd | 231,650.00 | Engaged to provide legal services and assist with the Fund's efforts to unfreeze the USD 496 Million held by Noor and general advice on UAE law. |
| Uzma Sarfraz dba Aurora International LLC | 60,000.00 | Engaged to provide services and assist with the Fund's efforts to unfreeze the USD 496 Million held by Noor |
| American Continental Group | 80,833.33 | Engaged to provide services and assist with the Fund's efforts to unfreeze the USD 496 Million held by Noor. |
| Covington & Burling LLP | 10,434.00 | Engaged to provide legal services and assist with the Fund's efforts to unfreeze the USD 496 Million held by Noor. |
| McCool Smith, A Professional Corporation | 85,641.54 | Engaged to provide legal services and assist with the Fund's efforts to unfreeze the USD 496 Million held by Noor. |
| Crowell & Moring | 2,576,349.69 | Engaged to provide legal and other services to the Fund and Port Link GP. |
| **Total** | **USD 7,312,436.32** | |

(App. 1, at pp. 80-81).

67.     For example, a number of invoices issued by Crowell to The Port Fund in connection with the matter identified as "Advice re Kuwaiti Legal Proceedings and Related Matters" show that The Port Fund paid Crowell for work Crowell performed for the benefit and on behalf of Lazareva. SC ¶¶ 85-87. Lazareva was: (i) the Vice Chairman and CEO of KGLI Kuwait; (ii) a director of the General Partner at all relevant times prior to May 24, 2018; and (iii) a director of the Investment Manager at all relevant times prior to February 4, 2019. SC ¶ 18.

68.     Crowell (i) advised Lazareva in connection with criminal claims and proceedings brought against her in Kuwait; and (ii) represented Lazareva in claims she brought for her own benefit in arbitration against the State of Kuwait before the International Centre for Settlement of Investment Disputes. SC ¶¶ 21, 29(iv), 85-87. Williams and the General Partner caused The Port Fund to pay Crowell for these services to Lazareva. SC ¶¶ 21, 29(iv), 82, 87-88, 99.

69.     Moreover, beginning in 2018, Lazareva engaged in an international lobbying campaign in response to the criminal charges that had been lodged against her in Kuwait. SC ¶¶ 21, 87-91. Crowell engaged various public relations firms, lobbying firms and individuals to provide services to Lazareva. SC ¶ 87.

70.     The General Partner caused Crowell, on behalf of The Port Fund, to pay the third-party service providers engaged by Crowell in connection with Lazareva's lobbying and public relations efforts. SC ¶¶ 21, 29(iv), 82, 87. As alleged in the Cayman Action, these payments included: USD 229,593.56 to Navigant Consulting, USD 260,795.18 to Marathon Strategies, LLC, and USD 1,405,930.69 to the law firm Squire Patton Boggs. App. 1, at pp. 80-81; SC ¶ 87.

71.     Crowell's invoices further show that The Port Fund was charged and paid for services that Crowell provided to KGLI Kuwait, the shareholders of the General Partner, including

Williams, and Apache. SC ¶87A. Petitioners allege in the Cayman Action that the authorization

of these payments constituted a breach of fiduciary duties to The Port Fund.  SC ¶¶ 91-92.

72.    As set forth in its proposed Rule 45 subpoena for documents directed to Crowell,

Petitioners seek the discovery of the following documents from Crowell for use in the Cayman

Action:

> All documents and communications relating to services performed by Crowell, or
> third parties engaged by Crowell, and invoiced to or paid for by The Port Fund
> and/or the General Partner from the time Crowell was engaged by The Port Fund
> to date, including without limitation:
>
> a.  All communications and records of communications involving any
>     representative of the General Partner, The Port Fund, Williams,
>     Lazareva, Dashti, KGLI Kuwait, and their respective agents regarding
>     the Disputed Services.
>
> b.  All communications and records of communications involving any of
>     the third parties providing the Disputed Services and any representative
>     of the General Partner, The Port Fund, Williams, Lazareva, Dashti,
>     KGLI Kuwait, and their respective agents regarding the Disputed
>     Services.
>
> c.  All internal communications, notes, memoranda or other documents
>     regarding the Disputed Services.
>
> d.  All engagement letters related to the Disputed Services.
>
> e.  All invoices related to the Disputed Services.
>
> f.  All documents and communications in relation to Crowell's conflicts
>     checks, anti-money laundering checks, or due diligence regarding the
>     Disputed Services.
>
> g.  All documents and communications in connection with payments
>     related to the Disputed Services.

(App. 2).

73.    As set forth in their Proposed Rule 45 Subpoena for Rule 30 (b)(6) Deposition,

Petitioners also seek testimony from Crowell under Federal Rule 30 (b)(6) with regard to the

following matters for use in the Cayman Action:

405969152-v1\NA_DMS

    a.   the identity of each service provider engaged by Crowell between November 1, 2017 and December 31, 2019 whose invoices were directly or indirectly paid by The Port Fund.

    b.   the nature of the services provided by each of the service providers identified above, including the reason for the services, the beneficiaries of the services and the manner in which the services benefitted The Port Fund.

(App. 3).

74.    The documents and testimony requested by Petitioners will show why these third parties were engaged, on what basis the payments using The Port Fund monies were made, whether those payments were in the best interests of The Port Fund and, accordingly, whether the payments constituted a breach of legal duties owed The Port Fund.  (App. 6, Declaration of Jennifer Fox, at ¶¶ 23-24).

## VIII.    ARGUMENT

### A.  Overview of Section 1782

75.    28 U.S.C. § 1782 governs the taking of discovery for use in foreign legal proceedings, providing in relevant part that:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. . . .  The order may be made pursuant to . . . the application of any interested person. . . .

28 U.S.C. § 1782(a); *see also Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 247 (2004) ("Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals").

76.    In considering a Section 1782 petition, U.S. courts engage in a two-step analysis. A court must first consider "whether it has authority to grant the request," and second consider "whether it should exercise its discretion to do so." *In re Barnwell Enterprises*, 265 F. Supp. 3d 1,

8 (D. D.C. 2017) *quoting Lazeridis v. Int'l Center for Missing and Exploited Children*, 760 F.

Supp. 2d 109, 112 (D. D.C. 2011).

**B.      This Court Possesses Authority to Permit the Petitioners to Obtain Discovery From Crowell for Use in the Cayman Action**

77.      Three requirements must be satisfied in order for a district court to possess authority

to allow discovery for use in a foreign proceeding: (i) the person from whom discovery is sought

must reside (or be found) in the district of the district court to which the application is made; (ii)

the discovery must be "for use" in a foreign proceeding before a foreign tribunal; and (iii) the

application for discovery must be made by a foreign or international tribunal or any interested

person. *In re Food Delivery Holding 12 S.a.r.l. v. DeWitty & Assoc., 2021 U.S. Dist. LEXIS 88302*

*\*8 (D. D.C. 2021), citing In re Veiga,* 746 F. Supp. 2d 8, 17 (D. D.C. 2010) (hereafter *In re Veiga*

*(I)*). The instant application readily satisfies each of these requirements.

78.      First, for purposes of Section 1782, Crowell "resides or is found" in the District of

Columbia. Crowell is "headquartered" and otherwise engages in systematic and continuous

activities in the District of Columbia. *See In re Application of Carlton Masters*, 315 F. Supp. 3d

269, 274 (D. D.C. 2018) (under Section 1782, an entity is found in the district in which it is

headquartered or "undertakes systematic and continuous local activities").

79.      Second, for the reasons explained above, Petitioners have shown that the discovery

they seek to obtain from Crowell is "for use" in the Cayman Action. Section 1782's "for use"

requirement is not an exacting one. Rather, the burden placed on Petitioners to show that the

requested discovery is "for use" in the Cayman proceedings is *de minimus. In re Veiga (I),* 746 F.

Supp. 2d at 18. As the district court explained in *In re Veiga (I),* "[t]he question under [Section

1782] is whether the applicant may make use of the discovery sought, not whether the foreign

tribunal will ultimately find it useful." *Id.* at 21. Indeed, it is not necessary for Petitioners to

establish that the requested discovery will be *admissible* in the Cayman proceeding. *Id.* at 17-18.

Nor is it necessary for Petitioners to establish that Crowell's documents and witness testimony

would be discoverable in the Cayman Islands if the relevant documents and witnesses were located

there. *Intel Corp.,* 542 U.S. at 259-60. In short, the "for use" requirement is satisfied here.

80.    Third, because Petitioners are plaintiffs in the Cayman Action, they qualify as

"interested persons" with standing to request discovery from Crowell under Section 1782. *See*

*Intel*, 542 U.S. at 256 (there is "[n]o doubt litigants are included among, and may be the most

common example of, the 'interested person[s]' who may invoke § 1782").

**C.    The Court Should Exercise its Discretion in Favor of Allowing Discovery Against Crowell**

81.    As noted above, in addition to determining that it possesses authority to permit

discovery for use in a foreign proceeding, the Court must also consider whether it *should* permit

such discovery. In exercising its discretion, the Court should consider four discretionary factors

(the so-called "*Intel* factors"):

> (i)    whether the person from whom discovery is sought is a participant in the foreign proceeding;
>
> (ii)   the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal court judicial assistance;
>
> (iii)  whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and
>
> (iv)   whether the subpoenas for documents and depositions contain unduly intrusive or burdensome requests.

*See Intel Corp.,* 542 U.S. at 252, 264-65. The district court need not weigh these discretionary

factors equally or treat any factor as more significant than another factor. *In Matter of Application*

405969152-v1\NA_DMS

*of Levet,* 51 F. Supp. 3d 66, 71 (D. D.C. 2014). For the reasons discussed below, each of these four

discretionary factors weighs in favor of permitting the requested discovery.

82.    First, Crowell is not a party to the Cayman proceedings. This weighs in favor of

granting the Petitioners' Section 1782 petition. As the U.S. Supreme Court explained in *Intel*

*Corp.*:

> [W]hen the person from whom discovery is sought is a participant in the foreign
> proceeding … the need for § 1782(a) aid generally is not as apparent as it ordinarily
> is when evidence is sought from a nonparticipant in the matter arising abroad. A
> foreign tribunal has jurisdiction over those appearing before it, and can itself order
> them to produce evidence. *** In contrast, nonparticipants in the foreign
> proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their
> evidence, available in the United States, may be unobtainable absent § 1782(a) aid.

542 U. S. at 264.

83.    Second, the nature of the Cayman court, the character of the Cayman proceedings,

and the Cayman court's receptivity to the assistance of the U.S. district court also weigh in favor

of allowing discovery against Crowell. In terms of gathering relevant evidence for use in

proceedings before them, Cayman courts routinely receive assistance from U.S. courts under

Section 1782. *See, e.g., Athos Asian Event Driven Master Fund v. Crawford Group, Inc.*, 2021

U.S. Dist. LEXIS 79008, *3-*6 (E.D. Mo. 2021) (granting Section 1782 discovery for use in

Cayman proceeding, where discovery sought documents relating to 16 topics and the deposition

of a corporate representative, and noting that "[t]there is no indication in the record here that a

discovery order would be unwelcome by a Cayman Islands court"); *In re Receivers Hugh Dicksen*

*and John Royle,* 2020 U.S. Dist. LEXIS 182888, *8 (D. N.J. 2020) ("Courts have recognized the

Cayman Court as a valid tribunal for Section 1782 purposes"); *Sandra Holding Ltd* v. *Al Saleh,*

2019 WL 307219 *4 (D Mass. 2019) (finding Cayman Court "receptive" to accepting discovery

obtained pursuant to Section 1782); *In re IJK Palm LLC,* 2019 U.S. Dist. LEXIS 88065 (D. Conn.

2019) (permitting Section 1782 discovery in aid of a shareholder derivative suit in the Cayman

Islands); *In re Platinum Partners Value Arbitrage Fund L.P.,* 583 B.R. 803, 816 (Bankr. S.D.N.Y. 2018) (holding that "far from being hostile to Cayman litigants seeking evidence under U.S. law, Cayman courts are in fact receptive to evidence obtained through U.S. discovery procedures, even if such evidence may not be discoverable under Cayman law"). *See also* App. 6, Declaration of Jennifer Fox, at ¶¶ 25-27.

84.    Third, the Petitioners' discovery against Crowell will not "circumvent" Cayman proof gathering restrictions. As noted above, Section 1782 does not require that the evidence sought from Crowell be discoverable in the Cayman proceedings. *In re Intel Corp.,* 542 U.S., at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts."). Moreover, as explained in the declaration of Petitioners' Cayman counsel, Petitioners' proposed discovery does not circumvent any proof restrictions or other restrictions applicable to the Cayman Action. (App. 6, Declaration of Jennifer Fox, at ¶¶ 28-29). Moreover, to date, no discovery has been undertaken in the Cayman Action and it is highly unlikely that the Cayman Action will be ready for trial for at least 18 months. (App. 6, Declaration of Jennifer Fox, at ¶ 12).

85.    Fourth, the discovery requested by Petitioners is not unduly intrusive or burdensome. As demonstrated above, the requested discovery is narrowly tailored and directly relevant to the claims and allegations contained in the Cayman Action. Even if this Court were to find that the discovery requests are overly broad (which is not the case), it need not deny the Application altogether; rather it may exercise its authority under Federal 26 to limit the requests and to reduce the burden on Crowell (though Petitioners do not believe that the proposed discovery is unduly burdensome or intrusive). Moreover, once the subpoenas are served on Crowell, if there

are ways in which the discovery requests can be revised to reduce any burden on Crowell while at the same time providing Petitioners with the documents and information they require, Petitioners will in good faith meet with Crowell to address this question.

> **D.    Attorney-Client Privilege is Not a Basis to Deny the Application.**

86.    Excluded from the scope of permissible discovery under Section 1782 are documents and testimony that are protected by applicable privileges. *See* 28 U.S.C. § 1782 ("A person may not be compelled to give his testimony or statement or to produce a document or thing in violation of any legally applicable privilege"). This provision has been construed to extend to the application of privileges arising under foreign law. *See In re Erato*, 2 F.3d 11, 14 (2nd Cir. 1993).

87.    As a procedural matter, however, it would be premature for this Court to consider the applicability of the attorney-client privilege and attorney work product doctrine to the documents and testimony sought by Petitioner as a basis to deny the instant Application. Although Petitioners do seek discovery from a law firm, only after the Application is granted, if and when these privileges are invoked by Crowell in response to Petitioners' Rule 45 subpoenas and in the context of objections to particular document requests and/or deposition questions/topics, will privilege be a relevant consideration for the Court. *See In re Food Delivery Holding 12 S.a.r.l. v. DeWitty & Assoc.*, 2021 U.S. Dist. LEXIS 88302, *15 (D. D.C. 2021) (permitting discovery directed against law firm under Section 1782 but noting that the law firm's production of documents may be "subject to any specific claims of privilege detailed in a privilege log produced by [the law firm]"); *In re Veiga (I)*, 746 F. Supp. 2d at 26 ("[T]he parties arguments concerning privilege are premature" and "[the][c]ourt simply [was] not in a position to resolve blanket claims of privilege and waiver").

88.     Additionally, attorney-client privilege and the work product doctrine are highly unlikely to preclude the discovery sought by Petitioners, in any event.  When and if the time comes that Crowell challenges the discovery sought by Petitioner, Crowell should not be permitted to "assert blanket or categorical claims of privilege; rather, the law 'requires a showing that the privilege applies to each communication for which it is asserted.'" *In re Veiga.* 746 F. Supp. 2d at 33, *quoting United States v. Legal Servs. for N. Y. C.*, 249 F.3d 1077, 1082 (D.C. Cir. 2001) (hereafter *In re Veiga (II)*).

89.     To the extent The Port Fund (or Crowell on behalf of The Port Fund) withholds documents or information on privilege grounds in the future, eventually the Court will likely consider several issues that are not presently the subject of this Petition. These issues include the application of any claimed privilege arising under foreign law, *i.e,* the choice of law question of whether foreign privilege law applies and the question of what the foreign privilege law is. *See, e.g., In re Veiga (II)*, 746 F. Supp. 2d at 33 ("Although the protections afforded by Section 1782(a) may extend to privileges recognized by foreign law, consonant with courts' reticence to delve into complex questions of foreign law, parties are generally required to provide clear and authoritative proof that a foreign tribunal would reject evidence pursuant to a foreign privilege before the court will invoke the privilege to bar discovery"); *Hulley Enterprises Ltd. v Baker Botts LLP*, 286 F. Supp. 3d 1, 9 (D. D.C. 2017) (applying U.S. law to privilege question where on the grounds that "[g]iven the parties' disputes about the protections provided by foreign law, the Court would be drawn into legal experts' debates about the meaning and scope of the laws of at least two, and perhaps more countries"); *In re PolygonGlobal Partners LLP*, 2022 U.S. Dist. LEXIS 6439, 86 (D. R.I. 2022) (a party seeking the application of foreign attorney-client privilege law must establish "with reasonable certainty" that foreign law should apply).

90.    Moreover, as it concerns the application of the attorney-client and/or work product privileges to Crowell's communications with the General Partner and Williams, at least two exceptions to the attorney-client privilege recognized in U.S. law will likely be engaged: (i) the fiduciary-beneficiary exception; (ii) the crime-fraud exception.

91.    Under the fiduciary-beneficiary exception, where legal advice is sought by corporate fiduciaries for the benefit of a corporation (and ultimately its shareholders) and corporate funds are used to pay for the legal advice, the attorney-client privilege does not protect attorney-client communications from disclosure to the shareholders in litigation involving claims of fiduciary wrongdoing. *See Garner v. Wolfinbarger*, 430 F.2d 1093, 1103-04 (5th Cir. 1970) ("… The attorney-client privilege still has viability for the corporate client. The corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders. But where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance.").

92.    The crime-fraud exception "comes into play when a privileged relationship is used to further a crime, fraud or other fundamental misconduct." *In re Sealed Cas*e, 676 F.2d 793, 807 (D.C. Cir. 1982). Communications between a client and attorney in furtherance of a crime or fraud are not protected by the attorney-client privilege. Nor is associated work product protected by the work product privilege. Here, there is evidence to show that Williams and / or the General Partner sought the advice of counsel to further their frauds. *See Jinks-Umstead v. England*, 233 F.R.D 49, 51 (D. D.C. 2006) (in determining whether the crime-fraud exception applies, "the relevant

405969152-v1\NA_DMS

question is: 'Did the client consult the lawyer or use the material for the purpose of committing a crime or fraud?'") (*quoting In re Sealed Cas*e, 676 F.2d at 814-15).

93.     The likely application of these principles weighs heavily in favor of considering The Port Fund's privilege objections only if and when they are asserted in Crowell's responses to Petitioners Rule 45 subpoenas.

## IX.     CONCLUSION

For these reasons, Petitioners pray that this Court grant this Application for Discovery for Use in a Foreign Proceeding.

Date:  July 5, 2022                    Respectfully submitted,

/s/ Jennifer Ancona Semko
Jennifer Ancona Semko
Graham Cronogue
BAKER McKENZIE
815 Connecticut Avenue, NW
Washington, DC 20006
202 835 4250
jennifer.semko@bakermckenzie.com

/s/ John M. Murphy
John M. Murphy
BAKER McKENZIE
300 E. Randolph Street
Suite 5000
Chicago, IL 60601
312 861 8085
john.murphy@bakermckenzie.com

405969152-v1\NA_DMS