UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APPLICATION OF KUWAIT PORTS AUTHORITY AND THE PUBLIC INSTITUTE FOR SOCIAL SECURITY FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | Case No. 22-mc-00064-RJL-RMM |

## REPORT AND RECOMMENDATION

Petitioners Kuwait Ports Authority ("KPA") and the Public Institution for Social Security ("PIFSS") (together, "Petitioners") have asked this Court, pursuant to 28 U.S.C. § 1782, to issue two subpoenas to Crowell & Moring LLP ("Crowell") to produce documents and provide testimony, for use in a foreign proceeding. *See* Application for Discovery for Use in a Foreign Proceeding, ECF No. 1 ("Application"). District Judge Richard J. Leon referred this matter to the undersigned for a Report and Recommendation pursuant to Local Civil Rules 72.1(b)(7), 72.2(a), and 72.3(a). *See* Min. Order, Aug. 30, 2022. For the reasons that follow, the undersigned recommends that this Court grant Petitioners' Application.[1]

---

[1] Crowell has not filed a formal response to the Application, despite being served with the Application. *See* Status Report at 3, ECF No. 7; Certificate of Service, ECF No. 6. It moved to intervene, over one year after Petitioners filed their Petition. *See* Mot. to Intervene, ECF No. 12; Sept. 1, 2023 Min. Order (granting motion to intervene). Crowell sought to intervene "for the limited purpose of correcting the misstatement of fact by Petitioners . . . that their Application is 'uncontested.'" Mot. to Intervene at 1. In its Motion to Intervene, Crowell stated that its interest is "ensuring that its privileged, confidential, or sensitive information is not disclosed . . . to ensure the Court has been provided with accurate information in evaluating Petitioners' Application." *Id.* at 4. Crowell wrote, in another filing, that it "has presently intervened for the purpose of correcting the record before the Court. Crowell will address the substance of Petitioners' Application upon the Court's ruling." Resp. Mot. for Status Conf. at *2, ECF No. 15. Thus, although the undersigned acknowledges that this Application is contested by Crowell, it does not construe Crowell's submission as a substantive response to the merits of the Application. If the Court grants Petitioners' Application, Crowell will have a full opportunity to object to the subpoenas under the Federal Rules of Civil Procedure.

## BACKGROUND[2]

Petitioners KPA and PIFSS are limited partners of The Port Fund, L.P. (the "Port Fund"), a limited partnership organized under Cayman law. *See* Application ¶¶ 1–2. KPA is a corporation that manages and operates seaports. *Id.* ¶ 7. PIFSS is a public pension fund. *Id.* ¶ 8. Both Petitioners are organized under the laws of Kuwait and maintain their principal place of business there. *Id.* ¶¶ 7–8. Petitioners are seeking this discovery related to a pending lawsuit in which they are plaintiffs in the Cayman Court's Financial Services Division, Cause No. FSD 236 of 2020 ("the Cayman Action"). *Id.* ¶ 1; *see* Re-Amended Writ of Summons, Application App. 1, ECF No. 1-1 at *3–100 ("Cayman Action Complaint"); Decl. of Jennifer Fox ¶¶ 2–5, Application App. 6, ECF No. 1-1 at *134–141 ("Fox Decl."). In the Cayman Action, the Petitioners allege that the Port Fund's general partner, Port Link GP (the "General Partner"), in concert with others, breached several duties it owed to the Port Fund by improperly using and diverting money belonging to the Port Fund. *See* Application ¶ 2; Fox Decl. ¶ 4. Crowell was counsel for the Port Fund related to the alleged improper transactions at issue in the Cayman Action and is the target of the requested discovery. *See* Application ¶ 3; Fox Decl. ¶ 14.

The Port Fund is a limited partnership initially formed to act as a private equity vehicle for investments in infrastructure assets globally. *See* Application ¶ 15. It is comprised of eleven limited partners. *Id.* ¶ 16. Petitioners invested 125 million U.S. dollars in the partnership and together hold over 60% of the investment. *Id.* The General Partner, a special purpose vehicle formed in 2007, held all rights and property in trust for the benefit of the Port Fund under Cayman law. *Id.* ¶ 17. The General Partner had three directors until May of 2018: Saeed Dashti (April 7, 2007–May 24, 2018); Marsha Lazareva (March 8, 2007–May 24, 2018); and

---

[2] The facts recited below are based on Petitioners' Application. *See* Application.

Abdulghfoor Alwadhi (date of tenure not specified). *Id.* ¶¶ 18–20. Port Link Holdings USA, Inc. ("Port Link Holdings") acquired the General Partner in March 2018. *Id.* ¶ 21. Mark Williams was the sole director and shareholder of Port Link Holdings, so he also controlled the General Partner of the Port Fund starting in May 2018. *Id.* ¶ 22. Mr. Williams also exercised significant control over the Port Fund's Investment Manager, KGL Investment Cayman Ltd ("Investment Manager"). *Id.* ¶¶ 23–24. Henry Aliffe acquired indirect ownership of the Investment Manager in January 2018—Mr. Aliffe was also the beneficial owner of Apache Asia Limited. *Id.* ¶ 25. The Investment Manager was ultimately dissolved in 2020. *Id.* ¶ 26.

The Cayman Action, originally filed in October of 2020, is in the initial pleading stages of the proceedings. *Id.* ¶ 1; Fox Decl. ¶ 9–10. KPA, PIFSS, and the Port Fund are plaintiffs in the action; Port Link Group Limited, Mark E. Williams, Wellspring Capital Group, Inc., and KGL Investment Company Asia are the defendants. *See id.* ¶ 1; Cayman Action Complaint. The operative complaint was filed in December of 2021. *See* Cayman Action Complaint; Fox Decl. ¶ 9. As of the filing of the Application, an appeal seeking a reversal of the lower court's denial of defendant's motions to strike (*i.e.*, dismiss) certain claims is pending before the Cayman Island's Court of Appeals. *See* Application ¶ 11; Fox Decl. ¶ 10. The defendants have filed defenses and have brought cross claims against both the Petitioners and the General Partner. *See* Application ¶ 12; Fox Decl. ¶ 11. Trial will begin January 19, 2026 and the parties are currently negotiating a discovery protocol. *See* Pet. Mot. for Ruling ¶ 7, ECF No. 20.

Petitioners seek discovery[3] related to three events that are at issue in the Cayman Action. First, the alleged Sham Dubai International Financial Centre ("DIFC") proceeding. Second,

---

[3] In support of their Application, Petitioner's note that their application for discovery from Citibank and E-Trade FinCorp in SDNY was granted in 2021 pursuant to 28 U.S. § 1782, and their application for information from the Port Fund's General Partner was granted by the

payments to Apache, Law Custodial, Inc., and KGLI Kuwait. Third, payments to lawyers, lobbyists, public relations consultants, and other third parties.

A.       **Alleged Sham DIFC Proceeding**

The first issue is the alleged Sham DIFC proceeding. This proceeding precipitated from a sale of an asset (referred to in the Application as the "Clark Asset") held by the Port Fund. *See* Application ¶ 28. A large portion of the proceeds from the sale, which were intended to be transferred to a bank account belonging to the General Partner, were frozen by the United Arab Emirates Central Bank for suspected money laundering, per the instructions of the Attorney General of Dubai. *Id.* ¶¶ 29–30. The Port Fund hired Crowell to advise on the protection and recovery of the frozen funds; Mr. Williams managed and directed the relationship with Crowell. *Id.* ¶¶ 31–33.

The following year, the Port Fund's Investment Manager filed claims against the General Partner and the Port Fund in the Dubai International Financial Centre (the "DIFC Court") alleging that the defendants failed to pay the Investment Manager fees, carry, and interest. *Id.* ¶ 35–37. The Port Fund and General Partner did not object to jurisdiction, although the litigants were Cayman entities, and the Investment Management Agreement contained a choice of forum clause and was governed by Cayman law. *Id.* ¶ 38. Both defendants ultimately filed a document conceding their joint and several liability for $56,808,505.00. *Id.* ¶ 39. The DIFC Court ultimately entered a final judgment in favor of the Investment Manager in that amount plus interest. *Id.* ¶ 41. During the DIFC proceedings, Crowell advised the Port Fund, the General Partner, and the Investment Manager. *Id.* ¶ 42.

---

Cayman Court in 2020 pursuant to Cayman Island law. *See* Application ¶ 14; Fox Decl. ¶¶ 13–14.

Once the funds were unfrozen by the Arab Emirates Central Bank, the General Partner instructed that a payment be made to Wellspring Capital Group for $59,990,461.30, presumably to satisfy the DIFC court's judgment entered in favor of the Investment Manager. *Id.* ¶ 44. Wellspring Capital is wholly owned by the Mark E. Williams Living Trust, whose trustees are Mr. Williams, his spouse, and his brother. *Id.* ¶ 45. In sum, the Application alleges that Mr. Williams "knowingly advanced an inflated and/or unfounded claim against the Port Fund on behalf of the Investment Manager, concluded the claim on behalf of The Port Fund and General Partner, and then directed that the enormous resulting sum be paid to an entity of which he and/or his family have a beneficial interest." *Id.* ¶ 46.

In support of its request for discovery related to the DIFC proceeding, the Application asserts that the "appropriateness and accuracy of Crowell's advice is highly relevant to the Cayman Action concerning whether Williams and the General Partner were justified in conceding jurisdiction and liability in the DIFC Court proceedings and whether in doing so they breached their fiduciary, statutory and contractual duties to the Port Fund." *Id.* ¶ 47. Petitioners specifically seek documents related to: (i) the claims underlying the litigation, (ii) the proceedings themselves; and (iii) the Wellspring payment. *Id.* ¶ 48. They also would like to depose two Crowell attorneys who managed the client relationship with the Port Fund and advised the Port Fund in connection with the DIFC proceeding. *Id.* ¶¶ 49–50.

**B.     Payments Made to Apache, Law Custodial, Inc., and KGLI Kuwait**

The second event at issue involves payments made to Apache, Law Custodial, Inc., and KGLI Kuwait from the sale proceeds of the Clark Asset. *Id.* ¶ 51. Prior to the sale of the Clark Asset, the Port Fund engaged Apache Asia Limited and its Macau affiliate ("Apache") to sell the Clark asset in exchange for a success fee. *Id.* ¶ 53. Apache was to receive a success fee of 7%

5

of the sale price if the sale price of the asset was over $600 million—the Clark Asset was sold for $65 billion. *Id.* The fees claimed by Apache were "between 4.5 and 7 time larger than the market rate." *Id.* ¶ 54. Apache "was closely associated with . . . The Investment Manager, William[s]'s brother, Matt Williams, and Williams." *Id.* ¶ 52. Apache provided "no real services" to the Port Fund related to the sale of the Clark Asset, and it had "no track record" of providing any advisory services to anyone, or any entity. *Id.* ¶¶ 54–55.

Days after the funds related to the sale of the Clark Asset were unfrozen, Apache sent an invoice to the General Partner for $36.2 million. *Id.* ¶ 56. Per the invoice, $14.55 million of it was owed by the Port Fund to KGLI (former owner of the Investment Manager); Crowell transferred this amount from the trust account to KGLI Kuwait per Apache's instruction. *Id.* ¶ 58. In the Cayman action, Petitioners allege that this payment was a kickback made to KGLI Kuwait in exchange for letting Apache collect the remainder of the success fee following the sale of the Clark Asset. *Id.* ¶ 59.

Crowell also transferred the remaining amount included in the Apache invoice, $21.65 million, from the Port Fund to an account held by Law Custodial Inc. at the OCBC Wing Hand Bank in Hong Kong. *Id.* ¶ 60. Petitioners allege that this payment amounted to a breach of the General Partner's duties to the Port Fund as well, and appeared to be for the benefit of KGLI, the Investment Manager, Mr. Williams, and other associated persons and entities. *Id.*

The Petitioners seek discovery from Crowell related to this transaction in the form of documents and deposition testimony, as Crowell time entries reveal that Crowell advised The Port Fund for work it performed in connection with these payments. *See id.* ¶ 61–62. They specifically seek "[a]ll documents and communications related to the [Apache invoice] payments" to Law Custodial Inc. and KGLI Kuwait, including but not limited to

6

communications about the transactions, both internal and external, engagement letters, invoices. *Id.* Petitioners also seek deposition testimony from Crowell related to Crowell's internal and external communications, and "consideration and analysis of the reasons for and the propriety of" the payments at issue. *Id.* ¶ 63.

**C.     Payments Made to Lawyers, Lobbyists, Public Relations Consultants, and Other Third Parties**

The final event for which Petitioners seek discovery are payments to lawyers, lobbyists, public relations consultants, and other third parties. Petitioners claim that the General Partner used funds stemming from the sale of the Clark Asset to pay firms and/or entities that provided legal, public relations, or lobbying services, which were not for the benefit and sometimes contrary to the interests of the Port Fund. *Id.* ¶ 65. The payments total approximately $7.312 billion. *Id.* ¶ 66.

Petitioners state that Mr. Williams and the General Partner caused the Port Fund to pay Crowell for services related to its representation of Lazareva, a former Director of the Port Fund, in connection with her international lobbying campaign resulting from criminal charges lodged against her. *Id.* ¶¶ 67–70. These payments are at issue in the Cayman Action. *Id.* ¶ 70. Crowell invoices also reveal that the Port Fund paid for services Crowell provided to KGLI Kuwait, and the shareholders of the General Partner (*i.e.*, Williams and Apache). *Id.* ¶ 71. Petitioners allege that these payments, among others, constituted breaches of fiduciary duties to the Port Fund. *Id.* ¶¶ 65–66, 71.

The discovery Petitioners seek related to this transaction include requests for both documents and deposition testimony. *Id.* ¶¶ 72–73. The request seeks documents and communications related to the "services performed by Crowell, or third parties engaged by Crowell," as well as those services "invoiced to or paid for by The Port Fund." *Id.* ¶ 72.

7

Petitioners also request a Rule 30(b)(6) deposition related to the identities of the service providers engaged by Crowell to which The Port Fund paid invoices. *Id.* ¶ 73. This discovery, Petitioners allege, would shed light on the nature of the payments and services. *Id.* ¶ 74.

## LEGAL STANDARD

Section 1782 permits federal courts to provide evidence-gathering assistance for use in foreign tribunals. *See Intel Corp. v. Adv. Micro Devices, Inc.*, 542 U.S. 241, 247–49 (2004). The assistance is available on an *ex parte* basis, *In re Masters*, 315 F. Supp. 3d 269, 272 (D.D.C. 2018), and the court may grant the request if it is "authorized to [do so]" and "exercise[s] its discretion to do so." *In re DiGiulian*, 314 F. Supp. 3d 1, 6 (D.D.C. 2018) (quoting *Norex Petroleum Ltd. v. Chubb Ins. Co. of Canada*, 384 F. Supp. 2d 45, 49 (D.D.C. 2005)). Absent a court order to the contrary, the discovery permitted must be conducted "in accordance with the Federal Rules of Civil Procedure." *Id.* at 5 (quoting 28 U.S.C. § 1782(a)).

## DISCUSSION

### I.     The Court's Authority

The undersigned recommends that this Court find it has the authority to grant Petitioners' Section 1782 request. Authority to grant the request turns on three statutory criteria: (1) the person or entity from whom discovery is sought must "reside in or be found within" the district; (2) the discovery must be "for use in" a "proceeding" before a foreign or international tribunal; and (3) the application must be "made by a foreign or international tribunal or any interested person." *DiGiulian*, 314 F. Supp. 3d at 6.[4]

---

[4] This Court has sometimes articulated the mandatory Section 1782 criteria as a four-part test. *See In re de Leon*, No. 19-mc-197, 2020 WL 1047742, at *2 (D.D.C. Mar. 4, 2020). The same showings are required under either construction. In the three-prong test, the second element requires that the discovery be "for use in" a "proceeding" before a foreign or international tribunal. *DiGiulian*, 314 F. Supp. 3d at 6. The proceeding need not be pending, but

8

The first element is satisfied because Crowell, the target of Petitioners' requested subpoenas, is located in the District of Columbia. *See* Application ¶ 6. A corporation is "found within" the district where it is headquartered or incorporated. *See Masters*, 315 F. Supp. 3d at 274–75 (collecting cases). Common principles of personal jurisdiction inform this analysis. *See id.* (quoting *In re Application of Thai-Lao Lignite (Thailand) Co.*, 821 F. Supp. 2d 289, 294 n.4 (D.D.C. 2011), for the principle that personal jurisdiction and § 1782's "found within" requirement "overlap considerably"); *see also De Leon*, 2020 WL 1047742 at *2 (adopting similar reasoning from the Second Circuit). Petitioners' statement that Crowell "maintains its principal office in the District of Columbia and can be found in this district" is enough to satisfy the undersigned that the company "resides or is found within" the District. Application ¶ 78. Although Crowell has law offices outside of D.C., Crowell's D.C. presence is not analogous to a branch location of a larger entity not headquartered in D.C. *See Masters*, 315 F. Supp. 3d 269, 274–77 (denying Application where petitioners failed to show that bank's retail locations and corporate sponsorship were sufficient to render a party "found" in D.C. for purposes of Section 1782).

Petitioners have also satisfied the second mandatory Section 1782 element. They seek documents and deposition testimony from Crowell to use as evidence in a Cayman lawsuit. *See* Fox Decl. ¶ 15. The discovery is "for use in a proceeding before a foreign or international tribunal" because the requested discovery—which seeks documents and testimony from Crowell related to its representation of the Port Fund—"directly concern[s]" the alleged improper

---

it must be "reasonably contemplated." *Id*. In the four-prong test, the "reasonably contemplated" rule is separated from the "for use" issue, possibly for added emphasis. *De Leon*, 2020 WL 1047742 at *2 (quoting *Intel*, 542 U.S. at 259)).

transactions described in the preceding paragraphs, "which [are] at issue in the [Cayman] proceeding." *Masters*, 315 F. Supp. 3d at 273–74; *see* Application ¶ 4; Fox Decl. ¶ 14.

The affidavit filed in support of Petitioners' request details several legal theories that might permit Petitioners to recover as Plaintiffs in the Cayman Action. *See* Fox Decl. ¶¶ 16–18 (describing Cayman Action claims related to DIFC Court proceedings), 19–22 (describing Cayman Action claims related to payments to Apache, Law Custodial, Inc., and KGLI Kuwait), and 23–24 (describing Cayman Action claims related to payments to lawyers, lobbyists, PR consultants and other third parties). The information and documents sought from Crowell are also "for use" in these contemplated proceedings because each request seeks information that bears on important questions raised in the Cayman Action. *See id.* ¶¶ 16–24.

Third, the Petitioners are both "interested person[s]" within the meaning of Section 1782 because they are litigants in the Cayman Action. *See Intel*, 542 U.S. at 256. There is "no doubt [that] litigants are included among, and may be the most common example of the 'interested person[s]' who may invoke section 1782." *Id.* In 2020, Petitioners commenced the Cayman Action for which discovery is sought; they remain plaintiffs in that case. *See* Application ¶ 10; Fox Decl. ¶¶ 5, 9. The Cayman Action is a live dispute and was in the pleading stages when the application was filed. *See* Application ¶ 11; Fox. Decl. ¶ 10. The Petitioners' request therefore satisfies all of the mandatory criteria, giving this Court authority to grant the application.

## II.     The Court's Discretion

The undersigned must next decide whether this Court should exercise its discretion to grant Petitioners' request. *See DiGiulian*, 314 F. Supp. 3d at 5–6 (noting that a court is "not required to grant a § 1782(a) discovery application simply because it has the authority to do so" (quoting *Intel*, 542 U.S. at 264)). The decision is guided by the statute's "twin aims" of

providing "efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." *Lazaridis v. Int'l Ctr. for Missing & Exploited Children, Inc.*, 760 F. Supp. 2d 109, 114 (D.D.C. 2011); *DiGiulian*, 314 F. Supp. at 7.  Four factors "bear consideration" as part of this analysis: "(1) whether 'the person from whom discovery is sought is a participant in the foreign proceeding,'" because if so "'the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad;' (2) 'the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the . . . court . . . abroad to U.S. federal-court judicial assistance;' (3) 'whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;' and (4) whether the request is 'unduly intrusive or burdensome.'" *DiGiulian*, 314 F. Supp. at 7 (quoting *Intel*, 542 U.S. at 264–65).  Weighing these factors is not required, and the Supreme Court has not articulated "a formula for their consideration."  *Id.* (internal quotation omitted).  This Court has nevertheless routinely relied on the *Intel* factors to evaluate Section 1782 requests.  *See id.*; *Norex Petroleum Ltd.*, 384 F. Supp. 2d at 49; *Lazaridis*, 760 F. Supp. 2d at 114.

      The first factor weighs in favor of granting Petitioners' request because they seek subpoenas addressed to a "nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264–65.  Petitioners seek to issue subpoenas directed to Crowell, who is not a defendant or party in the Cayman Action.  *See* Application ¶ 15–26.  There is no suggestion that Petitioners intend to sue Crowell separately or add Crowell as a defendant to the pending action.  Section 1782 provides a path to procuring evidence from individuals who are not participants in foreign

proceedings and therefore "may be outside the foreign tribunal's jurisdictional reach." *Intel*, 542 U.S. at 264.

The second factor weighs the nature of the foreign tribunal, the character of the proceedings, and the receptivity of the foreign court to U.S. judicial assistance. *DiGiulian*, 314 F. Supp. 3d at 7. The nature of the Cayman court system or the proceedings ongoing there do not raise concerns in this U.S. court. Courts in the United States also presume that foreign tribunals will be receptive to evidence obtained here, and ordinarily consider "only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782." *Id.* at 8 (citing *In re Caratube*, 730 F. Supp. 2d 101, 105–06 (D.D.C. 2010), and *In re Barnwell Enters. Ltd.*, 265 F. Supp. 3d 1, 10–11 (D.D.C. 2017)). There is no suggestion that the Cayman court would reject the evidence here. To the contrary, Petitioners' counsel asserts that the Cayman courts will be receptive to the evidence sought in this Section 1782 petition. *See* Fox Decl. ¶¶ 25–27 (citing a Cayman Islands Court of Appeal case). This factor thus also supports granting Petitioners' request.

The third *Intel* factor also weighs in Petitioners' favor. Nothing in the record indicates that Petitioners are seeking discovery via Section 1782 here to circumvent the proof-gathering rules or policies of either this Court or the Cayman Court. *See DiGiulian*, 314 F. Supp. 3d at 9 (evaluating this factor on lack of evidence in the record); *In re Veiga*, 746 F. Supp. 2d 8, 25 (D.D.C. 2010) (same). Petitioners' counsel represents that there is no requirement to seek permission from the Cayman Court before seeking relevant evidence abroad—the Cayman Court expects parties to obtain such relevant evidence. *See* Fox Decl. ¶¶ 28–29.

The last and final *Intel* factor weighs moderately in favor of Petitioners. Under this last factor, courts must consider whether the Section 1782 discovery request is "unduly intrusive or

burdensome." *Intel*, 542 U.S. at 265.  The standard in this context is substantially the same as under the Federal Rules of Civil Procedure.  *See, e.g.*, *DiGiulian*, 314 F. Supp. 3d at 9 (incorporating relevance considerations); *De Leon*, 2020 WL 1047742, at *3 (same); *Barnwell Enters.*, 265 F. Supp. 3d at 13–14 (incorporating burdensomeness balancing considerations, including the effect of temporal and subject-matter restrictions); *Veiga*, 746 F. Supp. 2d at 25 (concluding that Section 1782 request was "reasonably tailored" to the "claims and defenses raised in the proceedings at issue").  Courts have interpreted this inquiry to encompass "the relevance of the requested discovery to the foreign proceeding."  *In re an Ord. Pursuant to 28 U.S.C. §1782 to Conduct Discovery for Use in a Foreign Proceeding*, No. 17-mc-1466, 2017 WL 3708028, at *4 (D.D.C. Aug. 18, 2017) (citing *In re Veiga*, 746 F.Supp.2d at 19).

      The first proposed subpoena seeks documents pertinent to the three issues that implicate Crowell in the Cayman Action—the DIFC proceeding; the payments made to Apache, KGLI, and Law Custodial, Inc.; and the payments for services made by Crowell.  *See* Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, Application App. 2, ECF No. 1-1 at *102–16 ("Proposed Document Subpoena").  The second proposed subpoena seeks testimony from Crowell attorneys covering the same three issues.  *See* Subpoena to Testify at a Deposition in a Civil Action, Application App. 3, ECF No. 1-1 at *123–24 ("Proposed Testimony Subpoena").

      Both subpoenas seek information that is relevant and appropriately tailored to the claims at issue in the Cayman litigation.  *In re an Order Pursuant to 28 U.S.C. § 1782*, 2017 WL 3708028, at *4 (citing *In re Veiga*, 746 F. Supp. 2d at 19).  But they also seek information that could potentially be protected by the attorney-client privilege, such as Crowell's internal and external communications relating to its representation of the Port Fund, including legal advice

13

provided to the Port Fund, and Crowell's "consideration and analysis" about various legal claims and its decision making.  *See, e.g.*, Proposed Document Subpoena at *114 ¶ 2 ("All documents, including draft documents, internal communications and notes, relating or referring to Crowell's consideration, analysis and / or advice regarding the Investment Manager's claim(s) for breach of the Investment Management Agreement . . ."); Proposed Testimony Subpoena at *123 ¶ 1 ("[T]he advice Crowell provided The Port Fund, the General Partner, the Investment Manager, Williams and/or any other person or entity regarding same").  "A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege."  28 U.S.C. § 1782(a).  Petitioners recognize that their proposed subpoenas may seek at least some privileged information but argue that "it would be premature for this Court to consider the applicability of the attorney-client privilege and attorney work product doctrine . . . as a basis to deny the instant Application."  Application ¶ 87.

      Courts have reached conflicting results when determining whether to grant a Section 1782 petition for discovery of potentially privileged material.  Some courts have granted such applications, finding that it is premature to make privilege determinations at that stage.  *See, e.g.*, *Food Delivery Holding 12 S.a.r.l. v. DeWitty & Assocs. CHTD*, 538 F. Supp. 3d 21, 31 (D.D.C. 2021) (granting Section 1782 request and declining to resolve arguments about privilege related to the subpoenas, even with the benefit of the subpoena-recipient's perspective); *In re Veiga*, 746 F. Supp. 2d at 26 (same).  Some courts, however, have denied applications seeking to serve discovery for potentially privileged information.  *See In re an Ord. Pursuant to 28 U.S.C. §1782*, 2017 WL 3708028, at *5 (finding that the requested discovery raised attorney-client privilege concerns "too significant" to warrant granting the Application); *see also Sterne Kessler Goldstein & Fox, PPLC v. Eastman Kodak Co.*, 276 F.R.D. 376, 384–85 (D.D.C. 2011).  Courts

decline to grant applications in these circumstances when the petitioners' requested discovery "carr[ies] the substantial potential of spawning litigation over collateral issues related to assertion of privilege, scope, and relevancy, that only . . . impos[e] additional . . . delays and costs on both parties and burdens on the courts to resolve work-product and privilege objections." *Sterne Kessler*, 276 F.R.D. at 382.

The record developed thus far does not corroborate Crowell's assertion that "the subpoenas seek the production of information protected by the attorney-client privilege and Petitioners have not made a *prima facie* showing that the crime-fraud exception applies." Resp. Mot. for Status Conf., ECF No. 15 at *2. Crowell's intervention in this case was for, in Crowell's own words, "the limited purpose" of "correcting the misstatement of fact by Petitioners . . . that their Application is 'uncontested.'" Mot. to Intervene at 2. Crowell did not seek to present specific substantive arguments against granting the Application. *See id.* Crowell's brief comments on this issue in its opposition to the motion for status conference are simply broad blanket assertions of privilege and do not point the Court to any specific documents or requests that would fall under such a privilege.

As the scope of any privilege issues is currently unclear, the undersigned recommends that this Court refrain from deciding issues of privilege at this stage. Importantly, because the Federal Rules of Civil Procedure apply to subpoenas issued under Section 1782, if the Application is granted Crowell will have a full opportunity to object to the subpoena on burdensomeness, privilege, and related grounds under Rule 45(d). *See* 28 U.S.C. § 1782(a); *De Leon*, 2020 WL 1047742, at *1. If the subpoenas are unduly burdensome or require disclosure of privileged or other protected material, then, Crowell may move to have them quashed entirely or modified. *See* Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv).

15

As noted above, the subpoenas seek information that is highly relevant to the claims at issue in the Cayman litigation. That distinguishes this case from *In re an Ord. Pursuant to 28 U.S.C. §1782*, where the court found that "the requested discovery would be of limited usefulness to the [foreign] proceeding, at best." 2017 WL 3708028, at *5. The Cayman action filings state that Crowell was paid over 50 million dollars on behalf of the Port Fund for its services related to the three events at issue in the Cayman Action—evidence about Crowell's attorneys' involvement in the three events is undeniably relevant to Petitioners' claims in the Cayman Action. *See* Cayman Action Complaint ¶ 35.

The undersigned acknowledges that Crowell's status as a law firm makes it likely that at least some of the information sought may be privileged. But, as noted, that can be addressed through objections or motions practice, thereby ensuring that the discovery comports with the Federal Rules of Civil Procedure. Thus the fourth *Intel* factor weighs moderately in favor of Petitioners.

## CONCLUSION AND RECOMMENDATION

Accordingly, because the undersigned finds that this Court has authority to grant Petitioners' § 1782 request and the discretionary *Intel* factors weigh in favor of doing so, the undersigned recommends that this Court GRANT Petitioners' Application and Petition for an Order to Conduct Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782, ECF No. 1.

## REVIEW BY THE DISTRICT COURT

The parties are advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to a Report and Recommendation must file a written objection with the Clerk of this Court within fourteen days

of the party's receipt of the Report and Recommendation.  The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objection.  The parties are further advised the failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

Dated August 6, 2024.

_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE
