# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KUWAIT PORTS AUTHORITY, *et al.*,<br><br>          Petitioners,<br><br>     v.<br><br>CROWELL & MORING, LLP, *et al.*,<br><br>          Respondents. | Case No. 22-mc-64-RJL-MJS |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this Section 1782 proceeding, Petitioners Kuwait Ports Authority ("KPA") and the Public Institution for Social Security ("PIFSS") (together, "Petitioners") secured judicial approval to serve several subpoenas—one document subpoena and three deposition subpoenas (the "Subpoenas")—on Crowell and Moring, LLP and two individual lawyers (together, "Crowell"). The Subpoenas relate to Crowell's representation of a limited partnership in which Petitioners are two of the limited partners. Even though Crowell intervened in this case before the Court first authorized the Subpoenas, it did not substantively oppose the discovery at that time. Instead, after the Court evaluated and approved the Subpoenas, Crowell now moves to quash them in full under Federal Rule of Civil Procedure 45. Because Crowell fails to establish that the Subpoenas impose an undue burden, and because the Court agrees with Petitioners that the fiduciary-beneficiary exception abrogates any potential claim of attorney-client privilege or work-product protection, the Court **DENIES** the motion to quash (ECF No. 31) in substantial part, except to narrow the scope of the Subpoenas in a few limited respects described below.[1]

---

[1] This matter is referred to the undersigned as a non-dispositive motion pursuant to LCvR 72.2(a). Given that, and in keeping with "the great majority of courts to address this issue," the Court's ruling takes the form of a memorandum opinion and order rather than a report and recommendation. *In re Victoria, LLC,*

**BACKGROUND**

The Court's underlying opinions reasonably summarized the backdrop to this case. *In re Kuwait Ports Auth.*, 2024 WL 4183210 (D.D.C. Aug. 6, 2024) (Meriweather, M.J.), *report and recommendation adopted*, 2025 WL 1529798 (D.D.C. May 29, 2025) (Leon, J.). So the Court focuses here on the facts and procedural history that bear on the instant motion.

**I.    Relevant Factual Overview**[2]

The Port Fund, L.P. (the "Port Fund") is a limited partnership organized under Cayman law. (ECF No. 1 ("App.") ¶ 15.) It was formed as a private equity vehicle to invest in global infrastructure assets. (*Id.*) Petitioners KPA and PIFSS are two of eleven limited partners of the Port Fund. (*Id.* ¶ 16.) Between them, Petitioners collectively invested $125 million in the partnership and hold over 60% of Port Fund's total investment. (*Id.*) Port Link GP is the general partner of the Port Fund (the "General Partner"). (*Id.* ¶ 17.) Throughout the relevant timeframe, the General Partner held all rights and property of the Port Fund in trust for the benefit of the Port Fund. (*Id.*) In May 2018, Port Link Holdings USA, Inc. acquired the General Partner. (*Id.* ¶ 21.) Mark Williams was the sole director and shareholder of Port Link Holdings, so he functionally controlled the Port Fund's General Partner starting in May 2018. (*Id.* ¶ 22.) For a time, Williams also exercised significant control over the Port Fund's investment manager, KGL Investment Cayman Ltd. (the "Investment Manager"). (*Id.* ¶¶ 23–24.) In 2018, Henry Ayliffe—a beneficial owner of Apache Asia Limited ("Apache")—acquired indirect ownership of the Investment Manager. (*Id.* ¶ 25.) The Investment Manager was ultimately dissolved in 2020. (*Id.* ¶ 26.)

---

2018 WL 11229127, at *2 (S.D. Fla. Dec. 26, 2018) (ruling that U.S. magistrate judges are empowered to resolve a motion to quash discovery authorized under Section 1782) (collecting cases); *see also Norex Petroleum Ltd. v. Chubb Ins. Co. of Canada*, 2005 WL 8178298, at *1 (D.D.C. Mar. 9, 2005) (Kay, M.J.) (issuing an order, rather than an R&R, on a Section 1782 motion to quash and motion to compel).

[2] These facts are largely drawn from the Petitioners' application. But Crowell's submissions do not concretely dispute them, except where specifically indicated.

One of the Port Fund's investments was a development project in the Philippines known as Global Gateway Logistics City—an investment the parties refer to as the "Clark Asset." (App. ¶ 27.) In 2017, the Port Fund's interest in the Clark Asset was sold at a value of several hundred million USD. (*Id.* ¶ 28.) A substantial share of those proceeds was transferred for deposit in an account in Dubai held by the General Partner. (*Id.* ¶ 29.) Soon after, the funds were frozen by Dubai authorities, apparently on suspicion of money laundering and related concerns. (*Id.* ¶ 30.) In late 2017, the Port Fund engaged Crowell to assist with the recovery of the frozen assets. (*Id.* ¶ 31.) The funds were ultimately unfrozen and released in February 2019. (*Id.* ¶ 30.)

Meanwhile, in July 2018, the Port Fund's Investment Manager purported to terminate its agreement with the Port Fund, and it filed claims against the Port Fund and the General Partner in a Dubai court. (App. ¶¶ 35–37.) Broadly speaking, the Investment Manager claimed breaches of the investment management agreement owing to an alleged failure to pay various fees, carry, and interest. (*Id.* ¶ 37.) The Port Fund and General Partner conceded jurisdiction and venue in the Dubai court, and then promptly filed a document that essentially admitted to liability on the claims in an amount exceeding $56 million USD. (*Id.* ¶¶ 38–39.) The Dubai court entered judgment against the Port Fund and the General Partner. (*Id.* ¶¶ 40–41.) Crowell advised the Port Fund and General Partner in connection with the Investment Manager's claims in the Dubai court. (*Id.* ¶ 42.)

Once the Clark Asset funds were unfrozen by the Dubai authorities, the General Partner instructed the bank to initiate a payment in February 2019 that was ostensibly intended to satisfy the Dubai judgment—specifically, in the amount of nearly $60 million USD, made payable to Wellspring Capital Group, Inc. ("Wellspring"). (App. ¶¶ 43–44.) According to Petitioners, Williams is the CEO, CFO, President, Vice President, Treasurer, and Secretary of Wellspring. (*Id.* ¶ 46.) That same month, in February 2019, Apache invoiced the General Partner for $36.2 million

USD, ostensibly in connection with services provided by Apache surrounding the sale of the Clark Asset. (*Id.* ¶¶ 53–56.) Apache directed the General Partner to pay $14.55 million USD toward the total invoice to KGLI Kuwait, the former owner of the Investment Manager. (*Id.* ¶ 57.) The remaining $21.65 million USD on the invoice was to be transferred to a Hong Kong bank account held by Law Custodial Inc. ("Law Custodial"). (*Id.* ¶ 60.) Because at least some of the Clark Asset proceeds were being held by Crowell in trust for the Port Fund, Crowell was directed to make those payments its trust account; Crowell complied. (*Id.* ¶¶ 58, 60.) Finally, after the Dubai funds were unfrozen in early 2019, the General Partner authorized payments to another fourteen service providers—including certain law firms, public relations teams, lobbying groups, and more—for services ostensibly rendered on behalf of the Port Fund. (*Id.* ¶¶ 65–66.) According to Petitioners, the General Partner directed Crowell to make these payments from the trust account on behalf of the Port Fund, and Crowell did so. (*Id.* ¶¶ 69–70.)

In January 2020, KPA and other limited partners initiated a "Section 22" proceeding in the Cayman Islands, which permits limited partners to demand and receive information regarding the business and financial affairs of an exempted limited partnership under Cayman law. (ECF No. 31 ("Mot.") at 7.) Then, in October 2020, KPA and PIFSS initiated legal action against the General Partner (and other defendants) in the Cayman Islands, bringing both direct claims on their own behalf and derivative claims on behalf of the Port Fund itself. (App. ¶ 10.) In broad strokes, Petitioners allege in the Cayman litigation that the General Partner—in concert with Mr. Williams and others—committed various breaches of trust and violated duties to the Port Fund and its limited partners through the payments summarized above. (*See* ECF No. 1-1, App'x at 3–100.)[3] As noted, Crowell acted as counsel to the Port Fund and the General Partner in connection with

---

[3] Citations are to the page numbers assigned by the Court's electronic case-filing system.

those transactions, at least in some sense.[4] The Cayman action has been pending for several years, and the parties report that it is currently scheduled for trial in February 2026.

## II.    Procedural History

Petitioners commenced this Section 1782 action in July 2022, seeking court approval to pursue discovery from Crowell for use in the Cayman action. (*See generally* App.) Specifically, Petitioners asked the Court to authorize the issuance of four subpoenas—one document subpoena and three deposition subpoenas—to Crowell seeking various categories of discovery.

As Petitioners describe the Subpoenas, they seek three overall buckets of information: (1) documents and communications related to the Investment Manager's claims against the Port Fund and the General Partner in the Dubai court, including as related to the payments ostensibly made in satisfaction of the resulting judgment; (2) documents and communications related to the 2019 payments from the Port Fund to Apache, KGLI Kuwait, and Law Custodial; and (3) documents and communications related to approximately $7.3 million in total payments from the Port Fund to fourteen service providers identified in Petitioners' Application (¶ 66). (*See* ECF No. 1-1 at 102–16 (the "Document Subpoena").) Additionally, Petitioners were allowed to serve three deposition subpoenas, one directed to Crowell in a Rule 30(b)(6) capacity focused on essentially the same categories of information requested by the Document Subpoena, plus two directed to individual lawyers who were reportedly involved with the client relationship and the matters at issue. (*See id.* at 118–24, 126–28, 130–32 (the "Deposition Subpoenas").)

District Judge Richard Leon referred the case to former Magistrate Judge Robin Meriweather for a report and recommendation ("R&R"). (*See* Min. Order, Aug. 30, 2022.) In

---

[4] In its motion to quash, Crowell indicates that it was "acting as an escrow agent on behalf of the Port Fund" in connection with at least some of the payments at issue. (Mot. at 5.)

August 2023, while the application was still pending, Petitioners advised that they had served
Crowell through outside counsel (the same counsel now representing Crowell for purposes of this
motion) and noted that, given Crowell's non-appearance, the application was functionally
"uncontested." (*See* ECF No. 9 ¶ 4.) Three days later, Crowell filed a motion to intervene "for the
limited purpose of correcting the misstatement … that [Petitioners'] Application is 'uncontested.'"
(ECF No. 12.) The Court granted the motion to intervene. (Min. Order, Sept. 1, 2023.) In
subsequent filings, Crowell signaled its opposition to Petitioners' application on several grounds,
asserting in skeletal fashion that the Subpoenas requested privileged information, among other
objections. But Crowell never filed any substantive response to contest the application on any
basis. Instead, Crowell took the position that it would reserve its substantive arguments for a future
motion to quash, should the Court grant the application. (ECF No. 15 ¶ 7.)

In August 2024, Judge Meriweather issued an R&R recommending that the Court grant
Petitioners' Section 1782 application and authorize the Subpoenas. *See In re Kuwait Ports Auth.*,
2024 WL 4183210. Judge Meriweather found that Petitioners satisfied the three statutory criteria
to pursue the discovery under Section 1782, and that the four discretionary *Intel* factors likewise
supported Petitioners' application. *See id.* at *4–8.[5] Among other points, Judge Meriweather
determined that the Subpoenas "seek information that is relevant and appropriately tailored to the
claims at issue in the Cayman litigation." *Id.* at *7; *see also id.* at *8 (reiterating that the Subpoenas
"seek information that is highly relevant to the claims at issue in the Cayman litigation"). Judge
Meriweather recognized that the Subpoenas "seek information that could potentially be protected
by the attorney-client privilege" but declined to wade into those questions in the absence of
"specific substantive arguments" from Crowell. *See id.* at *7 ("Crowell's brief comments on this

---

[5] *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).

issue … are simply broad blanket assertions of privilege and do not point the Court to any specific documents or requests that would fall under such a privilege."); *see also id.* at *8 ("Crowell's status as a law firm makes it likely that at least some of the information sought may be privileged."). But the R&R took the view that any privilege concerns could be addressed through objections or motions practice, after issuance of the Subpoenas. *See id.* at *8.

Even though Crowell chose not to oppose Petitioners' application before Judge Meriwether, it nevertheless filed substantive objections to the R&R after it issued. (ECF No. 24.) On review, Judge Leon rejected Crowell's objections and adopted the R&R in full, issuing that order on May 29, 2025. *See In re Kuwait Ports Auth.*, 2025 WL 1529798. As an initial point, he ruled that Crowell waived any objections by failing to press its arguments before Judge Meriwether. *See id.* at *2 (citing *Klayman v. Jud. Watch, Inc.*, 6 F.4th 1301, 1312 (D.C. Cir. 2021) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.")). But Judge Leon rejected Crowell's arguments on the merits, too. In pertinent part, he agreed that the requested documents "are relevant to petitioners' direct and derivative claims in the Cayman action." *Id.* at *3. And while he recognized that the Subpoenas "do seek information that could be protected by the attorney-client privilege," Judge Leon agreed that it was "premature based on the record before the Court to make privilege determinations[.]" *Id.* at *4 (noting, among other things, Petitioners' arguments that "the crime-fraud and fiduciary-beneficiary exceptions apply to the privileged information").

On June 12, 2025, Crowell filed the current motion to quash. (ECF No. 31.) Judge Leon referred the matter to the undersigned. (Min. Order, June 17, 2025). On June 27, 2025—ten days after this case landed on the undersigned's docket—Crowell filed a notice of interlocutory appeal to the D.C. Circuit to challenge the original Section 1782 order authorizing the Subpoenas. (ECF

No. 35.) Because an appeal typically "divests the district court of its control over those aspects of the case involved in the appeal," *see Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982), this Court stayed its hand pending further developments on appeal. Neither side filed anything suggesting a different approach. Then, on November 3, 2025, Petitioners filed an emergency motion for a ruling (ECF No. 40), through which the undersigned learned for the first time that the D.C. Circuit issued an order holding the appeal in abeyance pending this Court's ruling on the motion to quash. *See* No. 25-7091, Order (D.C. Cir. Oct. 29, 2025). This Court promptly convened a virtual status conference the following afternoon. During that conference, the Court invited supplemental briefs from both sides on the fiduciary-beneficiary exception to the attorney-client privilege, along with any other issues either party wished to address. After those briefs were submitted (ECF Nos. 42, 43), the Court held a hearing on the motion to quash, after which it took the matter under advisement. This ruling now follows.

## LEGAL STANDARDS

"Section 1782 permits federal courts to provide evidence-gathering assistance for use in foreign tribunals." *In re Kuwait Ports Auth.*, 2024 WL 4183210, at *4 (citing *Intel*, 542 U.S. at 247–49). "Two layers of analysis govern applications under Section 1782: three statutory elements set forth in 28 U.S.C. § 1782(a), plus four discretionary factors outlined in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542. U.S. 241 (2004)." *Pishevar v. Fusion GPS*, 2025 WL 885115, at *8 (D.D.C. Mar. 21, 2025). "The first layer of the analysis focuses on whether the court '*can* order the requested relief,' while the second layer focuses on whether the court '*should* order the requested relief." *Id.* (quoting *In re Lucille Holdings Pte. Ltd.*, 2022 WL 1421816, at *7 (D.D.C. May 5, 2022) (emphasis in original)). As to the first layer, "[a] district court has the authority to grant an application when … (1) the person from whom discovery is sought resides or is found

within the district; (2) the discovery is for use in a proceeding before a foreign or international tribunal; and (3) the application is made by an interested person." *Id.* (citing 18 U.S.C. § 1782(a)). As to the second layer, courts consider: "(1) whether 'the person from whom discovery sought is a participant in the foreign proceeding'; (2) the nature and character of the foreign proceedings, and the foreign court's receptivity 'to U.S. federal-court judicial assistance'; (3) whether the 'request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States'; and (4) whether the request is 'unduly intrusive or burdensome.'" *Id.* at *11 (quoting *Intel*, 542 U.S. at 264–65).

If a court approves the requested discovery under Section 1782, the discovery target generally retains the ability to resist the discovery, including through appropriate objections or a motion to quash. In this way, "the standards for discovery set out in the Federal Rules of Civil Procedure also apply when discovery is sought under Section 1782(a)." *Pishevar*, 2025 WL 885115, at *3 (cleaned up) (quoting *In re Veiga*, 746 F. Supp. 2d 8, 19 (D.D.C. 2010)). Third-party subpoenas—as relevant here—are governed by Rule 45. And under Rule 45, a court "must quash or modify a subpoena that … requires disclosure of privileged or other protected matter, if no exception or waiver applies" or "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)–(iv). The party resisting the discovery "shoulders the responsibility" of demonstrating that the discovery would implicate privileged matter or otherwise impose an "undue burden." *Pishevar*, 2025 WL 885115, at *3; *In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*, 659 F. Supp. 3d 54, 58–59 (D.D.C. 2023) (undue burden); *Wye Oak Tech., Inc. v. Republic of Iraq*, 2018 WL 4473506, at *3 (D.D.C. Sept. 18, 2018) (privilege).

**DISCUSSION**

In its motion to quash, Crowell mounts two overall arguments against the Subpoenas. First, Crowell argues that the Subpoenas impose an undue burden, on the theory that Petitioners can obtain the same discovery directly from other parties in the Cayman action. (Mot. at 12–13; ECF No. 37 ("Reply") at 4–9.) And second, Crowell insists the Subpoenas are improper because they request "extensive" privileged materials and communications. (Mot. at 13–17; Reply at 9–12.) The Court takes each argument in turn, after first addressing Petitioners' contention that Crowell somehow waived or forfeited these arguments by choosing not to oppose their initial Section 1782 application on the merits, despite intervening at that initial stage of the case.

## I.    Petitioners' Waiver Theory

Petitioners posit that Crowell should be foreclosed from even raising its burden-related objections—including based on privilege—because Crowell made a strategic decision to forego any substantive arguments along these lines when the Court previously considered the issue of undue burden in authorizing the Subpoenas under Section 1782. (*See* ECF No. 42 ("Pet. Supp. Br.") at 6–8.) The fourth *Intel* factor under the governing analysis, after all, requires a court to consider whether the discovery would be "unduly intrusive or burdensome[,]" *Intel*, 542 U.S. at 265—a standard that is essentially coextensive with the standards relevant to a motion to quash under Rule 45. *In re Kuwait Ports Auth.*, 2024 WL 4183210, at *6 (collecting cases). And the same arguments that Crowell presses now were equally available to Crowell then. It follows, Petitioners argue, that "there is no point in litigating the same issue more than once." (Pet. Supp. Br. at 8.) Although the Court shares Petitioners' frustration with the inefficiencies and delays caused by Crowell's wait-and-see approach to this proceeding, the Court is not prepared to conclude—at

10

least not on this record—that those tactics triggered any waiver or forfeiture of Crowell's ability to seek to quash the Subpoenas on the grounds available to it under Rule 45.

Start with some background. Section 1782 applications are frequently decided on an *ex parte* basis, at least in the first instance. *Banca Pueyo SA v. Lone Star Fund IX (US), L.P.*, 55 F.4th 469, 474 (5th Cir. 2022) ("[I]t is not unusual for § 1782(a) applications to be made initially on an *ex parte* basis to the district courts[.]"); *Pishevar*, 2025 WL 885115, at *2 (observing that *ex parte* rulings on Section 1782 applications are "not uncommon in these sorts of proceedings"). This is so because the discovery target is generally not involved in the proceedings until after the discovery is authorized and served. In those scenarios—*i.e.*, where the discovery is approved *ex parte*—courts allow the discovery target to reargue the Section 1782 factors after appearing in the case, and to simultaneously argue why the discovery should be quashed under Rule 45. *See Pishevar*, 2025 WL 885115, at *8 (explaining why this *ex parte* dynamic means "courts should allow recipients of discovery authorized under Section 1782 to challenge the initial order's validity" and entertaining arguments under both Section 1782 and Rule 45) (cleaned up); *see also In re App. of Bapa Holdings, Corp.*, 2025 WL 3268248, at *1 (D.D.C. Nov. 24, 2025) (similar). Indeed, the Fifth Circuit has ruled that it is reversible error for courts to preclude that sort of "adversarial testing" where the challenged discovery was approved *ex parte* in the first instance. *Banca Pueyo*, 55 F.4th at 474–76. But the same considerations do not map so neatly onto a situation where, as here, the discovery target joins the proceedings *before* a court decides the Section 1782 application, with a full opportunity to challenge the discovery at that early stage. Where a discovery target in that circumstance chooses not to substantively oppose the discovery— at least based on categorical arguments of undue burden and privilege—does the target still retain the ability to challenge the requested discovery after it is approved?

Crowell treats that point as a given. It says that because Section 1782 states that any authorized discovery shall be *produced* "in accordance with the Federal Rules of Civil Procedure," 28 U.S.C. § 1782(a), the statutory language means a discovery target always retains the ability to *challenge* a Section 1782 subpoena "in accordance with the Federal Rules of Civil Procedure," including through a motion to quash under Rule 45(d)(3). (*See* Resp. Supp. Br. at 9–10.) The Court is not so sure. The cases Crowell cites for that argument all dealt with circumstances where Section 1782 applications were first granted on an *ex parte* basis; none involved a scenario where the discovery target intervened in the proceedings but opted not to substantively oppose the discovery before it was approved. *See*, *e.g.*, *Banca Pueyo*, 55 F.4th 469; *Texas Keystone, Inc. v. Prime Natural Resources, Inc.*, 694 F.3d 548 (5th Cir. 2012); *In re Clerici*, 481 F.3d 1324 (11th Cir. 2007); *In re Edelman*, 295 F.3d 171 (2d Cir. 2002). That important distinction aside, the closest case Crowell cites factually is likely *In re Edelman*, where the Second Circuit instructed a district court to consider a Rule 45 motion to quash on remand even after agreeing that the discovery was properly authorized under Section 1782 in the first instance. 295 F.3d at 181 ("Rule 45 may bar the deposition notwithstanding our holding that [the subpoena recipient] is not beyond the scope of § 1782(a)."). But again, that case implicated a subpoena originally issued on an *ex parte* basis, unlike here. And the Rule 45 consideration the Second Circuit flagged for further discussion on remand was not a potential concern of undue burden—which, again, mirrors one of the elements that must be analyzed as part of the original Section 1782 analysis—but rather whether the witness could be compelled to travel beyond the geographical limits specified in Rule 45(c). *See id.*

Crowell's position, moreover, creates significant tension with Federal Rule of Civil Procedure 1, which dictates that the Rules should be "construed, administered, and employed … to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R.

Civ. P. 1. And by Rule 1's terms, that is an obligation borne by both "the court and the parties." *Id.* Nothing about Crowell's approach to the Subpoenas fosters the "just, speedy, and inexpensive determination" of these proceedings, especially considering that all the same arguments Crowell now presses were evident and available to Crowell at the outset. Instead, notions of judicial efficiency and fairness point strongly in favor of requiring a discovery target in Crowell's position—one who joins Section 1782 proceedings before an application is granted, whether by way of intervention or otherwise—to mount any categorical burden- and privilege-related arguments at that juncture. This is not to say a party should be precluded from asserting particularized objections to discrete aspects of the discovery after a Section 1782 application is approved, or from moving to quash some specific subset of the discovery on certain grounds, including privilege. But where the discovery target intends to resist the discovery wholesale—through a global objection based on undue burden or privilege, as here—a straightforward application of Rule 1 leads to the conclusion that those arguments should be pressed at the initial stage. Greenlighting the opposite approach creates misaligned incentives. By taking a piecemeal approach, the discovery target can—and often does—delay completion of the discovery, generally to the detriment of the foreign proceedings for which the discovery is sought. This case presents a straightforward example. Crowell's motion to quash has forestalled the requested discovery for months now, even as trial in the Cayman action rapidly approaches. And more broadly, it squanders judicial resources to retread the overall propriety of discovery multiple times over.

All that said, the Court recognizes that it is not writing on an entirely clean slate here. In the R&R authorizing the Subpoenas, Judge Meriweather addressed Crowell's limited opposition to Petitioners' application and indicated that "Crowell will have a full opportunity to object to the subpoenas under the Federal Rules of Civil Procedure." *In re Kuwait Ports Auth.*, 2024 WL

4183210, at *1 n.1. Similarly, in adopting that R&R, Judge Leon opined that it was "premature" to address objections related to undue burden based on attorney-client privilege. *In re Kuwait Ports Auth.*, 2025 WL 1529798, at *4. On this specific record—including the past statements of other judges in this case, especially—the undersigned thinks it would be unfair to preclude Crowell from pressing its objections to the Subpoenas on the merits, and so it considers those objections in the sections that follow. But the Court's acquiescence should not be mistaken for an endorsement of Crowell's unnecessarily drawn-out approach to this proceeding.

## II.    Undue Burden

Turning to the merits of Crowell's objections, it first argues that the Subpoenas should be quashed on the basis that they are unduly burdensome because the information Petitioners seek is "available through parties to the Cayman action[.]" (Mot. at 12.) The Federal Rules of Civil Procedure contemplate that courts can properly limit discovery when it "can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i); *see also, e.g.*, *In re Lucille Holdings*, 2022 WL 1421816, at *16 (reaffirming that discovery can be unduly burdensome "[w]hen the information sought … is equally available through the foreign proceeding from a party to that proceeding"). Typically, that sensitivity is even more important in the context of third-party subpoenas. *Diamond Servs. Mgmt. Co., LLC v. Knobbe, Martens, Olson & Bear, LLP*, 339 F.R.D. 334, 339 (D.D.C. 2021) ("Concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs.") (cleaned up) (quoting *Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007)). Invoking these principles, Crowell asserts that because it already produced "its client file" to the General Partner as part of the Cayman proceedings, Petitioners should obtain those materials through discovery in the Cayman litigation, without burdening Crowell as a third party. (Mot. at

13.) Relatedly, Crowell posits that several categories of discovery—*e.g.*, communications between Crowell and other litigants to the Cayman proceedings—are equally available from those other parties in the first instance, without Crowell's involvement. (*See id.*) The Court is unpersuaded.

For starters, the premise of Crowell's argument—that the materials requested by the Subpoenas are equally obtainable in the foreign proceedings—is flawed. Crowell's counsel acknowledged during a recent status conference that the "client file" it produced to the General Partner in connection with the Cayman proceedings does not encompass all the materials that would be responsive to the Subpoenas. So even if Petitioners were successful in obtaining the full "client file" through the Cayman discovery process, they still would not have the full set of materials requested by the Subpoenas. In short, as Crowell itself has conceded, the discovery at issue is not "equally available" through the foreign proceedings.

Moreover, Petitioners explain that they *have* tried to pursue much of the same discovery they seek here through the Cayman proceedings, but without much to show for it. (*See* ECF No. 32, ("Opp'n") at 22; *see also* ECF No. 44, Nov. 18, 2025 Motions Hrg. Tr. ("Hrg. Tr.") at 24:10–27:21 (Petitioners' counsel describing their efforts)). The Court agrees with Petitioners that Section 1782 does not impose some sort of "exhaustion" requirement along these lines. *See In re Kuwait Ports Auth.*, 2025 WL 1529798, at *3 ("Section 1782(a) does not, however, require petitioners to exhaust their discovery options with parties to the Cayman action before seeking discovery from Crowell.") (citing *In re Veiga*, 746 F. Supp. 2d at 24 ("Section 1782(a) does not incorporate an exhaustion requirement, and an applicant is not required to first seek discovery from the foreign tribunal."). But even still, Petitioners' effort to pursue this discovery in the Cayman litigation further weakens Crowell's position that the Court should quash the subpoenas on this basis. *See, e.g., Darling v. Girard*, 2015 WL 13898434, at *8 (D.D.C. July 20, 2015) (crediting a party's

unsuccessful efforts to obtain discovery from other sources in upholding enforcement of subpoena) (citing *Estate of Esther Klieman v. Palestinian Auth.*, 293 F.R.D. 235, 242–43 (D.D.C. 2013)).

Otherwise, beyond its "equally available" objection, Crowell raised another burden-related argument during the motions hearing: that the scope and volume of the materials requested by the Subpoenas would impose too heavy a lift on Crowell in responding, whether measured in time, financial expense, or both. (*See* Hrg. Tr. at 6:24–7:11.) There are several problems with this newfound argument. For one thing, Crowell never pressed it in writing. Absent exceptional circumstances, "arguments raised for the first time at oral argument are forfeited[,]" *U.S. ex rel. Davis v. Dist. of Columbia*, 793 F.3d 120, 127 (D.C. Cir. 2015), and Crowell identifies no exceptional circumstances here. Indeed, Crowell would be particularly hard-pressed to do so considering that it has been aware of the Subpoenas for years now, with ample opportunity to prepare and articulate the basis for its objections in its long-promised motion to quash. Yet Crowell failed to mount any undue-burden argument along these lines in its written briefing. For another thing, even setting Crowell's forfeiture problem to the side, Crowell fails to explain how or why the burden of responding to the Subpoenas would be *undue*, much less with any specificity. Among other shortcomings, Crowell fails to articulate the specific number of responsive documents implicated by the Subpoenas, the number of custodians whose records are believed to be implicated by the Subpoenas, how many hours Crowell anticipates it would need to expend to search for and collect documents in response to the Subpoenas, and so on. Crowell certainly does not engage with the Subpoenas on a request-by-request basis, arguing that a particular category of documents is especially onerous or unnecessarily broad, for instance. As the party resisting the Subpoenas, the burden falls on Crowell to explain its undue-burden objections with specificity. *See, e.g.*, *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, 2019 WL 5864595, at *2 (D.D.C. Nov.

8, 2019) ("Vague and conclusory assertions are not sufficient; rather, a showing of undue burden must be specific and concrete.") (citation and quotations omitted); *see also Flanagan v. Wyndham Int'l Inc.*, 2005 WL 8168150, at *2 (D.D.C. Sept. 13, 2005) (explaining that to quash a subpoena under Rule 45, a showing of undue burden "must be specific"). And on that score, Crowell comes up far short. Accordingly, even if the Court were to consider this gloss on Crowell's undue-burden argument on its merits, it would fail for these reasons.[6]

## III.    Privilege Issues

Crowell mounts a more full-throated objection to the Subpoenas on the basis that they seek what Crowell characterizes as "extensive privileged materials and privileged communications," *i.e.*, those implicating an attorney-client privilege between Crowell and its clients, the Port Fund, and the General Partner. (Mot. at 13–16.) Petitioners insist otherwise. They begin by arguing that Crowell fails to adequately invoke the privilege, both because it failed to produce a privilege log and because Crowell essentially concedes that not every responsive document would be privileged. More broadly, Petitioners say that the fiduciary-beneficiary exception and crime-fraud exception circumvent any privilege claim on these facts. After careful consideration, the Court concludes, based on the specific circumstances presented here, that the fiduciary-beneficiary exception overcomes Crowell's invocation of attorney-client privilege over the requested discovery (at least as narrowed by the Court toward the conclusion of this ruling).

---

[6] This latest undue-burden argument is separately undercut by Crowell's position that it already collected and produced its full "client file" to the General Partner in connection with the Cayman proceedings. Even if that file is not fully responsive to the Subpoenas, the fact remains that Crowell, by its own telling, already undertook the process of compiling and producing at least a meaningful portion of the requested documents. (*See* Reply at 6 (asserting that "Crowell produced extensive documents to the Receivers for Port Link GP, including, among other things, documents reflecting Crowell's provision of legal services to the Port Fund and Crowell's invoices (both paid and unpaid).").) In responding to the Subpoenas, Crowell ought to be able to reproduce those same files to Petitioners—or at least parts of them, depending on responsiveness— without any significant expense of additional time or resources as to that subset of materials, while supplementing with additional responsive documents as necessary.

A.        The Attorney-Client Privilege

"The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services." *Tax Analysts v. I.R.S.*, 117 F.3d 607, 618 (D.C. Cir. 1997) (citation omitted). "The privilege also protects communications from attorneys to their clients if the communications rest on confidential information obtained from the client." *Id.* (citation and quotations omitted). As our Circuit has explained, "the proponent of a privilege bears the burden of demonstrating facts sufficient to establish the privilege's applicability." *In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740, 750 (D.C. Cir. 2006). To meet that burden, the party invoking the privilege must demonstrate its applicability "by way of affidavits or other competent evidence," *Alexander v. FBI*, 192 F.R.D. 42, 45 (D.D.C. 2000) (citation and quotation omitted), "beyond conclusory statements, generalized assertions, and unsworn averments of its counsel," *F.T.C. v. Boehringer Ingelheim Pharms., Inc.*, 180 F. Supp. 3d 1, 16 (D.D.C. 2016) (citation and quotations omitted).

Against these baseline principles, the Court recognizes that a meaningful swath of the information requested by the Subpoenas—*i.e.*, documents concerning a law firm's representation of its clients—will certainly implicate the attorney-client privilege. But the Court cannot say that is universally true. And Crowell does not say that either. As Petitioners point out, the most Crowell says along these lines is that the requested documents "consist overwhelmingly" of privileged materials. (Reply at 11.) In other words, Crowell acknowledges—implicitly, anyway—that at least some of the requested documents are not privileged. Crowell's supporting affidavit filed in support of its motion to quash (ECF No. 31-2) does not help matters much. As to the scope of materials requested by the Subpoenas, the most Crowell articulates with any specificity is that "Crowell represented Port Link and Port Fund for many years across varied, lengthy and complicated

18

matters; logging all the associated privileged documents would take a significant amount of time." (*Id.* ¶ 7.) Even taking that statement at face value, it fails to establish a factual basis for Crowell to invoke the attorney-client privilege as a universal shield against production of the entire range of documents and information that would be responsive to the Subpoenas.

Crowell's nonproduction of a privilege log further complicates the Court's consideration. Ordinarily, a party withholding otherwise responsive documents based on the invocation of a privilege—including the attorney-client privilege—must provide a contemporaneous privilege log that describes the nature of the materials held with sufficient specificity, but "without revealing information itself privilege or protected," to "enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii). A failure to do so often operates as a waiver of the privilege. *Wye Oak*, 2018 WL 4473506, at *3 ("[D]efendants have waived any assertion of attorney-client privilege or attorney work-product doctrine by not providing a privilege log."). That said, several cases in this District have explained that a privilege log is not necessarily required when the discovery would implicate "production of an attorney's records in connection with representation of a client." *Hulley Enters. Ltd. v. Baker Botts LLP*, 286 F. Supp. 3d 1, 7 (D.D.C. 2017) ("Otherwise, any objection to the scope of a discovery demand would be rendered moot because interposing that objection would trigger the very burdensome obligation to prepare a privilege log that the objection would be intended to avoid.") (collecting cases); *Menashe v. Covington & Burling LLP*, 552 F. Supp. 3d 35, 44 (D.D.C. 2021) ("Separating protected documents … from those not subject to privilege and work product would require a painstaking document-by-document review of all the information in Covington's client file[.]").[7] The Subpoenas here implicate that principle, at least

---

[7] After all, "[a]ttorneys are under strict obligations to their client to preserve confidential information, protect their clients' interests, and prevent disclosure of privileged attorney-client communications or other information obtained during the representation that could harm the client." *Menashe*, 552 F. Supp. 3d at 44.

in meaningful part. The Court thus declines to hold that Crowell waived any privilege by failing to prepare and produce a privilege log. But to return to the broader point about whether Crowell can universally refuse to respond to the Subpoenas based on a generalized invocation of privilege, Crowell's failure to meaningfully explain its process for reviewing and evaluating the materials requested by the Subpoenas—whether through a privilege log or otherwise—leaves the Court with concrete concerns as to whether Crowell fully carried its privilege burden on this record.

But ultimately, the Court does not need to parse those consequences more fully because, for the reasons explained next, the Court agrees that the fiduciary-beneficiary exception overcomes Crowell's privilege claims as to the discovery requested by Petitioners through the Subpoenas here, at least as narrowed by the Court in a few modest respects.

### B.    The Fiduciary-Beneficiary Exception

By many accounts, the fiduciary-beneficiary exception traces its roots to the Fifth Circuit's decades-old decision in *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), *cert. denied*, 401 U.S. 974 (1971). *Garner* held, in essence, that a corporation cannot invoke the attorney-client privilege against its own shareholders when the potentially privileged information relates to the subject of a later lawsuit by the shareholders against the corporation, at least where the shareholders establish good cause to obtain the information. *See id.* at 1103–04. The rationale behind this rule rested on a "particularized context": "where the client asserting the privilege is an entity which in the performance of its functions acts wholly or partly in the interests of others, and those others, or some of them, seek access to the subject matter of the communications." *Id.* at 1101 (emphasizing that "management does not manage for itself and that the beneficiaries of its actions are the stockholders"). Courts have since extended this holding into other contexts, recognizing that it encompasses other "fiduciary relationships such as between unions and

members, lawyers and other lawyers, banks and clients, general partners in a partnership and

general partners and limited partners." *Henry v. Champlain Enters., Inc.*, 212 F.R.D. 73, 84–85

(N.D.N.Y. 2003) (citations omitted).

While it does not appear that the D.C. Circuit has squarely addressed the fiduciary

exception, several courts within this District have done so. In *Cobell v. Norton*, for instance, Judge

Lamberth applied the fiduciary exception in the context of a trustee-beneficiary relationship,

explaining that it vitiates the attorney-client privilege as to "communications between a trustee and

its attorneys concerning the administration of the trust," at least when the communications are

sought by the beneficiaries of the trust (rather than some outside party). 212 F.R.D. 24, 27 (D.D.C.

2002). The court summarized the rationale behind the exception as follows:

> As a representative for the beneficiaries of the trust which he is administering, the
> trustee is not the real client in the sense that he is personally being served …. The
> very intention of the communication is to aid the beneficiaries. The trustee here
> cannot subordinate the fiduciary obligations owed to the beneficiaries to their own
> private interests under the guise of attorney-client privilege.

*Id.* (quoting *Washington-Baltimore Newspaper Guild, Local 35 v. Washington Star Co.*, 543 F.

Supp. 906, 909 (D.D.C. 1982) (citation omitted)). *Cobell* went on to apply the fiduciary exception

to require a witness to testify about advice received from legal counsel regarding trust

administration. *See id.* at 30–31; *see also Cavanaugh v. Saul*, 2007 WL 1601743, at *2–4 (D.D.C.

June 4, 2007) (similar, applying exception to require ERISA plan fiduciaries to produce otherwise

privileged documents to plan beneficiaries). Further, in *Wessel v. City of Albuquerque*, former

Magistrate Judge Kay applied the exception in the union context, ruling that it overrode the

attorney-client privilege as invoked by a union against its members to permit discovery into legal

advice given to the union concerning the interests of its members. 2000 WL 1803818, at *4–7

(D.D.C. Nov. 30, 2000).

The Court is not aware of a case from this District applying the fiduciary exception in the partnership context, as between a general partner and limited partners or otherwise. But courts outside this District have recognized the exception's applicability in these circumstances. *Henry*, 212 F.R.D. at 84-85; *see also Lugosch v. Congel*, 219 F.R.D. 220, 243–44 (N.D.N.Y. 2003) (addressing fiduciary exception in partnership dispute but ultimately deeming it inapplicable because the contested materials related to non-fiduciary matters); *Fortson v. Winstead, McGuire, Sechrest & Minick*, 961 F.2d 469, 475 n.5 (4th Cir. 1992) (considering fiduciary exception as applied to limited partnership but finding it inapplicable for lack of "good cause").

Importantly, Crowell does not contest the potential applicability of the fiduciary exception as a general matter. It does not argue, for instance, that the fiduciary exception can never extend to the relationship between a general partner and its limited partners. And neither does Crowell argue that no fiduciary relationship existed between its client(s), the Port Fund and the General Partner, and Petitioners as limited partners of The Port Fund. This is true despite Petitioners' stated position that the general partner of an exempted limited partnership under Cayman law owes fiduciary duties to the limited partners. (Opp'n at 26 (citing Section 19(1) of the Cayman Islands Exempted Limited Partnership Act, online at https://perma.cc/5N69-WMQW).) Instead, Crowell mounts four nuanced arguments against the exception. The Court addresses Crowell's various arguments below, but before doing so, the Court explains why the materials requested by the Subpoenas, at least as a starting point, generally fall within the contours of the fiduciary exception.

### 1.    The Fiduciary-Beneficiary Exception's Threshold Applicability

As noted, the Subpoenas seek discovery of three broad categories of materials: (1) documents and communications related to the Investment Manager's claims in the Dubai court and the ensuing proceedings and judgment; (2) documents and communications related to the 2019

payments from the Port Fund to Apache, KGLI Kuwait, and Law Custodial; and (3) documents and communications related to approximately $7.3 million in total payments from the Port Fund to fourteen other service providers to the Port Fund.[8] Petitioners appropriately proffer that any privileged communications on these subjects between Crowell and its clients were undertaken— or at least should have been undertaken—not only for the benefit of the General Partner and the Port Fund, but also the limited partners of the Port Fund, including Petitioners. *See Garner*, 430 F.2d at 1101; *Cobell*, 212 F.R.D. at 27 (explaining that the exception applies where the "intention of the communication is to aid the beneficiaries"). After all, the General Partner and the limited partners alike would have been aligned in expecting sound legal advice as to legal claims asserted against the Port Fund and the General Partner, including the appropriate resolution of those claims and the satisfaction of any resulting judgment. So, too, as to any privileged communications surrounding the Port Fund's payments to the enumerated list of outside providers who reportedly provided services to the Port Fund—and thus, indirectly, the Port Fund's limited partners.

Against that foundation, Crowell retains the burden to demonstrate that the fiduciary exception is inapplicable. *Cobell*, 212 F.R.D. at 27 ("[W]here the 'fiduciary exception' is at issue, the proponent of the privilege retains the burden to demonstrate the applicability of the privilege."). As the Court discusses next, Crowell's various arguments come up short.[9]

---

[8] The Court previously ruled these categories of discovery are "highly relevant to the claims at issue in the Cayman litigation." *In re Kuwait Ports Auth.*, 2024 WL 4183210, at *8. And Crowell passed up the opportunity to challenge that proposition in the first instance when it declined to file any substantive opposition to Petitioners' Section 1782 application despite having an opportunity to do so.

[9] Both sides assume that U.S. federal common-law governs the privilege issues in this case, so the Court does the same. But even if the Court were to apply Cayman law, the outcome would seemingly be no different because Cayman law recognizes something comparable to the fiduciary-beneficiary exception in the limited partnership context. *See In re Torchlight Fund, L.P.*, Case No. FSD 103 (RMC) (Grand Court of the Cayman Islands, 2015) (holding that a general partner in a limited exempted partnership is generally not allowed to claim privilege against the partnership's own limited partners), filed at ECF No. 32-2. In fact, earlier this year, the Cayman court in the underlying litigation here issued a ruling along these very

### 2.    Crowell's Counterarguments Fail To Foreclose The Exception

As previewed, Crowell mounts four relatively limited arguments against the applicability of the fiduciary-beneficiary exception on these facts. None prevails.

*First*, Crowell argues that even if the fiduciary exception can abrogate the attorney-client privilege in some instances, it can never trigger the production of materials covered by the work-product doctrine. (Reply at 17–19; Resp. Supp. Br. at 9.) The Court is unpersuaded. "The work-product doctrine shields materials 'prepared in anticipation of litigation or for trial[.]'" *Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005) (quoting Fed. R. Civ. P. 26(b)(3)). The doctrine "is broader than the attorney-client privilege in that it is not restricted solely to confidential communications between an attorney and client," but at the same time "narrower … insofar as the doctrine protects only work performed in anticipation of litigation or for trial." *F.T.C. v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015) (citations omitted). Crowell cites a few out-of-circuit cases suggesting that the fiduciary exception cannot overcome the work-product doctrine. (Resp. Supp. Br. at 9 (citing *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1239 (5th Cir. 1982); *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 524 (S.D.N.Y. 2001).) But several cases from this District hold otherwise. *See, e.g.*, *Cavanaugh*, 2007 WL 1601743, at *3 ("[T]he argument that the fiduciary exception does not apply to the work product doctrine has been rejected in this jurisdiction."); *Wessel*, 2000 WL 1803818, at *5 ("The fiduciary-beneficiary exception may also be applied to defeat protected work product."). The Court agrees with the reasoning in those latter cases and rejects the idea of some broad-based rule that the fiduciary exception can never abrogate a claim of work-product protection.

---

lines, holding that the General Partner generally cannot withhold privileged materials from Petitioners during the discovery process unless they pertain to the ongoing litigation itself. (*See* ECF No. 38-1.)

After all, even the cases cited by Crowell were premised on a more nuanced rationale: that the underlying "mutuality of interest" animating the fiduciary exception did not apply to work-product materials prepared in the context of an "adversarial relationship." *In re Int'l Sys.*, 693 F.2d at 1239 ("It is not reasonable to indulge in the fiction that counsel, hired by management, is also constructively hired by the same party counsel is expected to defend against."); *see also Strougo*, 199 F.R.D. at 524 (ruling that the fiduciary exception did not apply to materials prepared after the filing of litigation between a corporation and its shareholders). But here, the categories of information captured by the Subpoenas do not obviously implicate that sort of "adversarial relationship" between Petitioners, on the one hand, and the General Partner or the Port Fund, on the other. The requested discovery focuses on legal claims asserted against the General Partner and the Port Fund by a third-party investment manager (not by Petitioners), payments made to satisfy the judgment against the General Partner and the Port Fund resulting from those claims, and the General Partner's payment to other third-party service providers on behalf of the Port Fund. And while there is *now* litigation underway between Petitioners and the General Partner (and others), the materials Petitioners seek all predate that litigation, at least following counsel's clarification at the hearing that Petitioners do not seek documents or communications created after 2019. (*See* Hrg. Tr. at 19:10–20:12.) Moreover, Crowell simply presses its work-product argument in the abstract, without articulating any concrete examples of specific documents or categories of documents that it suggests would qualify as the sort of work product that might arguably fall outside the fiduciary exception's ambit, whether based on the logic of their cited cases or otherwise. As explained, Crowell bears the burden of establishing the applicability of potential privileges or protections. It comes up short. *See Solis v. Food Emps. Lab. Rels. Ass'n*, 644 F.3d 221, 231 (4th Cir. 2011) (upholding district court's application of the fiduciary exception because

the party resisting the discovery "failed to identify which documents should remain privileged and why," including by "specify[ing] individual communications to which the privilege applied or submit[ting] a privilege log for the district court's assessment").

**Second**, invoking *Garner*'s "good cause" requirement, Crowell argues that Petitioners cannot establish the requisite "good cause" to pierce the attorney-client privilege in this case. (Reply at 17–19; Resp. Supp. Br. at 6–9.) The Court disagrees. The *Garner* court identified a non-exhaustive list of indicia that can show "good cause" to overcome the privilege in this context:

> [T]he number of shareholders and the percentage of stock they represent; the bona fides of the shareholders; the nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; whether the communication related to past or to prospective actions; whether the communication is of advice concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.

*Garner*, 430 F.2d at 1104. Courts largely agree that the party seeking to pierce the privilege bears the burden of establishing "good cause." *See, e.g.*, *Callas v. Callas*, 2019 WL 449196, at *3 (D.N.J. Feb. 4, 2019); *Chill v. Calamos Advisors, LLC*, 2017 WL 1478123, at *3 (N.D. Ill. Apr. 25, 2017) (collecting cases). Ticking through the various indicia, Petitioners carry that burden here. They represent the interests of two of the eleven limited partners in the Port Fund, comprising approximately 60% of the overall investment stake, as well as the Port Fund itself (in a derivative capacity). Their claims in the Cayman action are certainly colorable, as reflected in no small part by the fact that they survived the functional equivalent of a motion to dismiss and a subsequent appeal. (*See* Opp'n at 27 n.5.) The requested discovery is "highly relevant" and important to the Cayman litigation, *see In re Kuwait Ports Auth.*, 2024 WL 4183210, at *8, and Petitioners have been unable to obtain it from other sources despite reasonable efforts. The Cayman litigation is

26

premised on claims of wrongful action by the General Partner (and others). The discovery relates to past actions, not prospective ones, and so it does not implicate the General Partner's ability to communicate confidentially with counsel presently or moving forward. And the Subpoenas are a not some blind fishing expedition; the requests are targeted and focused on a few categories of information that bear directly on the issues at stake in the Cayman action. All in all, Petitioners have ably demonstrated "good cause" to pierce the privilege under the *Garner* factors.

Against those points, Crowell presses a few arguments to the contrary. (*See* Resp. Supp. Br. at 6–9.) None scuttles Petitioners' showing. One, Crowell says that Petitioners fail to establish that the information they seek cannot be obtained from other sources, including parties to the Cayman litigation. This argument fails for the same reasons that led the Court to reject Crowell's undue burden argument on the same basis. Two, Crowell minimizes Petitioners' proportional stake in the Port Fund because they are only two of eleven limited partners. But as noted, these two partners are far from bit players; they comprise more than half of the underlying investment in the Port Fund. And more, Petitioners represent the Port Fund itself in a derivative capacity, so Crowell's focus on limited-partner nose-counting is slightly misplaced overall. Three, Crowell insists that Petitioners are engaged in a fishing expedition, but the Court disagrees for the reasons just stated. At most, Crowell focuses on Request No. 7 in the Document Subpoena, which implicates "all documents and communications relating to services performed by Crowell." (*Id.* at 8.) The Court agrees that request is drafted more broadly than necessary, so it will narrow that request as explained more fully below. But beyond that, the Subpoenas are reasonably tailored. And four, Crowell argues that the Subpoenas "pose a substantial risk of disclosing confidential information in which [the] Port Fund and [the General Partner] have an independent interest." (*Id.*) Even if true, the Court can assuage those concerns by requiring an appropriate protective order to

govern any documents and information Crowell produces in response to the Subpoenas. In sum, "good cause" exists to employ the fiduciary exception here.

**Third**, Crowell argues that Petitioners cannot invoke the fiduciary exception against Crowell here because there was no fiduciary relationship between Petitioners and Crowell. (Resp. Supp. Br. at 3–5.) This misunderstands the relevant analysis. The privilege Crowell invokes to quash the Subpoenas is a privilege held by its clients, the Port Fund and the General Partner—a point that Crowell acknowledges. (*See* Mot. at 13 n.13.) And it is Crowell's clients' privilege, not Crowell's privilege, that the fiduciary exception touches here.[10] So it is beside the point whether Crowell had an independent fiduciary relationship with Petitioners or owed them any independent legal or ethical duties by virtue of its representation of the General Partner and the Port Fund. The fiduciary relationship between the General Partner and Petitioners is what matters. And Crowell does not dispute or even really touch on the existence of that fiduciary relationship.

**Fourth**, Crowell argues—for the first time in its supplemental brief—that Petitioners fail to demonstrate the "mutuality of interest" necessary to trigger the fiduciary-beneficiary exception here. Crowell rightly posits that the exception "is premised on a shared interest between a fiduciary and its beneficiaries in the retention and use of legal advice." (Resp. Supp. Br. at 5.) But as the Court described already, Crowell fails to concretely explain how the discovery captured by the Subpoenas would sweep in privileged materials that did not mutually benefit the General Partner

---

[10] In a footnote in its reply brief, Crowell raises for the first time a concern that the Document Subpoena implicates Crowell's own privilege through Request No. 5, which seeks documents surrounding Crowell's own "conflicts checks, anti-money laundering checks, or due diligence." Reply at 12, n.5. According to Crowell, "[s]uch communications are protected by Crowell's own privilege" and thus are beyond the reach of the fiduciary exception. (Resp. Supp. Br. at 9 n.4.) Crowell fails to support this argument with any legal authority, however. And based on the Court's own research, the limited caselaw on this subject suggests that "[t]he production of conflict memoranda, new matter forms, and correspondence regarding conflicts is not protected by the attorney-client privilege or work product doctrine." *E. Maine Baptist Church v. Regions Bank*, 2007 WL 1445257, at *2–3 (E.D. Mo. May 10, 2007). In the absence of a more fulsome argument from Crowell on this point, the Court will not quash Request No. 5 on this basis.

and the Port Fund's limited partners, including Petitioners. As Crowell's briefing recognizes, "[t]he key element is the mutuality of interests between a fiduciary and the beneficiary … *at the time the communications to counsel are made*." (*See id.* (quoting *In re Atl. Fin. Mgmt. Sec. Litig.*, 121 F.R.D. 141, 146 (D. Mass. 1988)) (emphasis added).) And at the time the relevant communications were made here, there was a mutuality of interest—and certainly no obvious adversarial relationship—as to the relevant categories of materials. The Port Fund, the General Partner, and the Port Fund's limited partners all ought to have been mutually aligned in expecting sound legal advice as to the Investment Manager's legal claims against the Port Fund and the General Partner. The same holds true as to any privileged communications about payments to satisfy the resulting judgment on those claims, as well as other payments made to third parties that provided services to the Port Fund.

Crowell says any mutuality here was destroyed "after Petitioners took a number of adverse actions against Port Fund and its personnel." (Resp. Supp. Br. at 5.) Primarily, Crowell claims that "Kuwaiti authorities," in late 2017, detained and later filed criminal charges against two of the General Partner's prior directors, and that the Kuwait Attorney General, in May 2018, asked Dubai to transfer some of the then-frozen Clark Asset proceeds directly to Petitioners. (*Id.* at 5–6.) In addition, Crowell says that in August 2019, "KPA issued a press release accusing Port Fund of crimes against Kuwait[.]" (*Id.* at 6.) In support, Crowell cites exclusively to a May 2020 declaration (ECF No. 31-1) submitted by one of the firm's partners in a different Section 1782 proceeding in the Southern District of New York, and the declaration itself references a variety of other materials that were not provided to the Court here. These arguments miss the mark. For one thing, Crowell's reliance on an outside lawyer's summary characterizations in a years-old declaration from another proceeding in another court—without proffering any of the underlying

source materials that ostensibly support those characterizations—paints a decidedly incomplete picture for this Court's consideration. For another thing, even assuming some adversity in connection with the events reported, Crowell fails to persuasively explain why that potential adversity would extend to the categories of information that the Subpoenas request. As the Third Circuit has ruled, "*[c]omplete* mutality is not a requirement for the fiduciary exception to apply." *Wachtel v. Health Net, Inc.*, 482 F.3d 225, 235 n.4 (3d Cir. 2007) (emphasis in original) ("We believe that conflicts of interests must be judged using a sliding scale on a case-by-case basis"). The primary category of information at issue here relates to legal proceedings brought by the Port Fund's former Investment Manager against the Port Fund, as well as the Port Fund's satisfaction of the judgment resulting from those proceedings, which strikes the Court as unrelated to the alleged instances of potential adversity referenced by Crowell. There is certainly no obvious connection between the two, and Crowell does not develop any concrete argument on that point. The other categories of information could conceivably present a closer call given the potential overlap concerning the Clark Asset proceeds that were temporarily frozen in Dubai. But Crowell again leaves that argument undeveloped. Any potential overlap notwithstanding, Crowell fails to explain why it believes Petitioners did not share a mutual interest in ensuring that the Port Fund made reasonable, appropriate payments to Apache and others for their reported services in connection with the Clark Asset sale. And the same holds true as to the other service-provider payments implicated by the Subpoenas; Crowell certainly does not argue that any of those payments related to adversarial matters with Petitioners in a way that might destroy mutality.

Further, and to pull back for a moment, Crowell's arguments ignore an important dynamic about Petitioners' stance in the Cayman proceedings. Not only do Petitioners represent themselves and their own interests, but they have been approved by the Cayman courts to represent the Port

Fund's interests more broadly in a derivative capacity. In other words, Petitioners are proceeding in the Cayman action on behalf of the Port Fund itself. So even if the Court were to believe that Crowell established a concrete adversity of interest between the Port Fund and *Petitioners* based on the events referenced, it does not follow that this same adversity would arguably extend to adversity between the Port Fund and *itself*. Crowell wholly fails to grapple with this point, but it strikes the Court as an important—and perhaps independent—basis to reject Crowell's position.

Beyond those events, Crowell points to three other events as destroying mutuality: Petitioners filing a lawsuit against the General Partner in the Cayman Islands in January 2020; Petitioners filing another lawsuit against the General Partner in the Cayman Islands in October 2020; and Petitioners threatening to sue Crowell in 2021. (Resp. Supp. Br. at 6.) But as noted, Petitioners are limiting the scope of the Subpoenas to a timeframe ending in 2019, before all those events transpired. The Court follows Petitioners' lead on that point and restricts the Subpoenas accordingly, which means the Court need only decide the mutuality question up to that juncture.

\*    \*    \*

To sum up, the Court finds that the fiduciary-beneficiary exception abrogates any claim of attorney-client privilege that Crowell asserts over the discovery requested by the Subpoenas, at least as narrowed in a few modest respects below. The Court emphasizes, however, that this ruling does nothing to upset any potential privilege that may apply to the requested documents as to the outside world writ large. The Court's finding is limited to Crowell's production to Petitioners, as limited partners of the Port Fund, in these specific circumstances.[11]

---

[11] Because the Court agrees that the fiduciary-beneficiary exception overrides Crowell's invocation of the attorney-client privilege, it need not reach Petitioners' alternative argument as to the crime-fraud exception. *See, e.g.*, *Aull v. Cavalcade Pension Plan*, 185 F.R.D. 618, 626 (D. Colo. 1998) (taking same approach).

## IV.    The Deposition Subpoenas

Beyond Crowell's broader objections to the Subpoenas, it presses a handful of separate arguments as to the why the Court should quash the Deposition Subpoenas that it authorized under Section 1782. These arguments are likewise unavailing.

To begin, Crowell resists the Deposition Subpoenas on the same overall grounds as to the Document Subpoena: Crowell argues that the Deposition Subpoenas would impose an undue burden and implicate "a range of privileged topics." (Mot. at 17–19.) The Court rejects these arguments for the same reasons already explained. Beyond that, Crowell argues that Petitioners fail to show "good cause" to allow the depositions of legal counsel. (*See id.* at 18–23; Reply at 19–20.) It is true that courts are often reluctant to permit attorney depositions, but that reluctance is typically premised on the concern that the deposition will implicate the disclosure of privileged information. But here, the Court's determination on the fiduciary-beneficiary exception—at least as to the information encompassed by the Subpoenas—obviates any privilege-related concerns. And while Crowell otherwise argues that Petitioners must satisfy the Eighth Circuit's three-part test to depose opposing counsel, *see Shelton v. Am. Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986), the Court agrees with the decisions from this District recognizing that "[t]he *Shelton* test … is limited to circumstances in which the proposed deponent is serving as the opposing party's trial or litigation counsel[.]" *Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co.*, 276 F.R.D. 376, 379 (D.D.C. 2011).[12] Crowell does not assert that it is serving as "trial or litigation" counsel for the General Partner (or the Port Fund) in the Cayman litigation, so *Shelton* is inapplicable here.

---

[12] *Shelton* held that depositions of opposing counsel should only be permitted if: "(1) no other means exist to obtain the information other than to depose opposing counsel; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." 805 F.2d at 1327.

Simply put, given the Court's analysis of the burden and privilege issues implicated, it does not find any separate basis to quash the Deposition Subpoenas in their own right. The Court will, however, limit the permissible scope of questioning for the individual deposition subpoenas to the categories of information requested by the Document Subpoena and the 30(b)(6) subpoena to Crowell, both as further narrowed below. After all, those are the categories of discovery on which the Court has concluded that the fiduciary-beneficiary exception abrogates any claim of privilege or work product, and so those are the categories that are proper subjects of discovery.

## V.    The Court Will Narrow The Subpoenas In Limited Part

Notwithstanding the broader holdings outlined above, the Court does believe it appropriate to narrow the Subpoenas in a few modest respects. The Court does so even though Crowell did not make any arguments against the Subpoenas on a request-by-request or category-by-category basis. All the same, the Court recognizes that it "properly considers relevance in evaluating a motion to quash a subpoena" under Rule 45. *Pishevar*, 2025 WL 885115, at *5. And when viewed through a relevance lens, the Court finds that certain aspects of the Subpoenas sweep more broadly than Petitioners' own description of the discovery that they seek.

First, as noted, the Court will narrow the applicable timeframe for all the Subpoenas to the period from Crowell's original retention through the end of 2019. Crowell need not produce materials or information outside that period, even if otherwise responsive to the Subpoenas.

Second, on the Document Subpoena, the Court will modify the text of Request No. 7 so that its scope is limited to information about the "Disputed Services" as defined by Petitioners:

> 7.      *All documents and communications relating to <u>the Disputed Services</u> [~~services performed by Crowell, or third parties engaged by Crowell and/or acting at Crowell's instruction, and paid for by the Port Fund and/or the General Partner from the time it was engaged by the Port Fund to date~~], including without limitation ...*

Because the inclusive subparagraphs (a) through (g) are already limited to the "Disputed Services," the Court does not further narrow those aspects of Request No. 7 in the Document Subpoena.

Third, turning to the 30(b)(6) Deposition Subpoena to Crowell, the Court imposes two similarly focused restrictions to narrow the identified topics of examination, so that they focus on the "Disputed Services" where applicable. To this end, the Court will strike Topic No. 7 altogether; as limited to the defined group of Disputed Services, Petitioners already enumerate the relevant service providers. Relatedly, the Court will modify Topic No. 8 to read as follows:

> 8.   The nature of the _Disputed Services_ [~~services provided by each of the service providers identified in response to the foregoing matter~~], including the reasons _for_ [~~of~~] the services, the beneficiaries of the services, and the manner in which the services benefitted the Port Fund.

Finally, as noted above, the Court will limit the permissible scope of the individual depositions (directed at David C. Hammond and Justin Kingsolver) to the categories of information requested by the Document Subpoena and the 30(b)(6) subpoena to Crowell.

## CONCLUSION AND ORDER

For the reasons explained, the Court hereby **DENIES** Crowell's motion to quash in substantial part, except to modestly narrow the Subpoenas in the limited respects described. The Court will condition Crowell's compliance on the entry of an appropriate protective order to limit the permissible use of any discovery provided in response to the Subpoenas to the Cayman proceedings. Within fourteen (14) days, the parties shall file a proposed protective order along these lines. Within twenty-one (21) days, Crowell shall produce documents and information to

Petitioners in response to the Document Subpoena. Finally, within thirty-five (35) days, Crowell shall produce witnesses to testify in response to the Deposition Subpoenas.[13]

**SO ORDERED**.

Dated: December 17, 2025

                                          _____
                                             MATTHEW J. SHARBAUGH
                                             United States Magistrate Judge

---

[13] The Court sets these deadlines with an eye toward the fact that trial in the Cayman proceedings is rapidly approaching and currently scheduled to begin in February 2026.